MORRISON, Appellant,

v.

GUGLE et al., Appellees.

[Cite as *Morrison v. Gugle* (2001), 142 Ohio App.3d 244.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 00AP–681.

Decided April 12, 2001.

246

*Stephen E. Maher,* for appellant.

*Michael P. Vasko,* for appellees.

PEGGY BRYANT, Presiding Judge.

Plaintiff-appellant, Judith C. Morrison, appeals from a judgment of the Franklin County Court of Common Pleas granting directed verdicts to defendants-appellees, Pamela M. Gugle and Michael P. Vasko, on plaintiff's claims of wrongful termination and defamation. Because the trial court erred in granting directed verdicts to defendants, we reverse.

In January 1994, plaintiff and Gugle, who are twin sisters, decided to open a consignment store for upscale furniture in Columbus. In May 1994, the two sisters incorporated under the name An Elegant Encore. Pursuant to the terms of the articles of incorporation each sister owned fifty percent of the corporation's stock. Gugle was the president of the corporation, plaintiff was secretary-treasurer, and the two sisters were the only members of the board of directors. The business plan called for each sister also to be a salaried employee.

In November 1994, plaintiff and Gugle received $10,000 each from their mother. The remaining start-up capital of $80,000 was acquired through a loan from the First National Bank of Zanesville ("FNB"). The loan was guaranteed by the Small Business Administration ("SBA") and secured by Gugle's home. Each sister was liable on the loan.

An Elegant Encore opened for business in March 1995. Approximately four weeks into operations, on April 21, 1995, Gugle had a meeting with corporate counsel, Michael Taylor. Plaintiff contends that Gugle met with Taylor to discuss methods by which Gugle could remove plaintiff from the business. Gugle maintains that she met with Taylor for guidance because she wanted to hire an accountant to oversee the books.

Without divulging the reasons behind the meeting, Taylor sent a follow-up letter to Gugle on April 24, 1995, that stated that the best result would be for the sisters to resolve their differences and continue operating the business. In the letter Taylor reminded Gugle that, pursuant to their meeting, she should forward

to him copies of the stock redemption agreement, lease, SBA loan documents, and any other contracts that had been entered into on behalf of the corporation. Taylor further indicated that pursuant to her powers as president, Gugle could terminate plaintiff's employment, and if plaintiff was terminated, the stock redemption agreement, a signed copy of which was never produced at trial, would require plaintiff to sell her stock to the corporation. Taylor nonetheless cautioned that a court might find such a termination unenforceable because Gugle would be terminating plaintiff's employment without cause in order to gain control of the company. The only other two options, according to the letter, were for the two sisters to negotiate a mutually satisfactory buy-out of plaintiff's stock, or dissolve the corporation through litigation.

Until July 1995, Christy Nickolosi was assisting An Elegant Encore with its bookkeeping. While the sisters disputed whether she was a certified public accountant, she informed the sisters in July that she could no longer assist the company. In response, plaintiff and Gugle hired the accounting firm of Taranto and Associates, who worked with An Elegant Encore from November 1995 through March 1996.

In October 1995, Peter Schulte, the boyfriend of plaintiff's and Gugle's sister, prepared a set of recommendations for An Elegant Encore; the letter containing the recommendations is addressed solely to Gugle. At the time, Schulte operated his own business, but had no formal qualifications in finance or economics. Not only did An Elegant Encore not pay Schulte for his recommendations, but plaintiff contends that she was unaware of Schulte's actions.

In addition to common business recommendations, the Schulte letter recommended that Gugle take plaintiff off the corporate credit cards immediately. Further, without identifying the problem, the letter indicated that the only solution may be to remove plaintiff from the corporation, and it recommended that the parties attempt to reconcile their differences.

On January 26, 1996, plaintiff was presented with a letter, drafted by co-defendant Vasko, an attorney, which proposed a buy-out of plaintiff's interest in the business. The letter indicated that Vasko had been retained as counsel by Gugle, the president of An Elegant Encore. The letter stated that Gugle had learned of certain abuses of credit cards, a checking account, and inventory that warranted a change in the business relationship. To that end, the letter requested that plaintiff convey all of her interest in An Elegant Encore to Gugle.

Pursuant to the terms of the proposed buy-out, plaintiff (1) would be able to keep the German Village store location by assuming the lease, (2) would not be allowed to use the name An Elegant Encore, (3) would return all corporate inventory currently in her personal residence and all nonconsignment inventory in the German Village location, (4) would pay off one-half of the then current

outstanding balance on the SBA loan, and (5) would reimburse the corporation for all unauthorized use of the corporate credit cards and the corporate checking account, although the proposal did not indicate the nature of unauthorized use. Finally, the proposal, which was hand-delivered to plaintiff at her home on Friday, January 26, 1996, required plaintiff to answer by 9:00 a.m. on Monday, January 29, 1996. Plaintiff did not respond to the proposal.

On January 29, 1996, Gugle, acting under her power as president of An Elegant Encore, had Vasko call plaintiff and terminate her employment. During the telephone call, Vasko read plaintiff's termination letter to her. The letter, subsequently mailed to plaintiff, indicated that plaintiff would no longer be granted access to the corporate business locations, plaintiff's presence would be considered an act of trespass, the locks and security codes had been changed, the police had been notified, and the computer had been security-locked to prevent unauthorized access. After her termination, plaintiff had no further contact with An Elegant Encore, and Gugle continued to operate the business.

On the same day plaintiff was fired, Gugle wrote a letter to FNB requesting that the bank close An Elegant Encore's existing account and open a new account to which Gugle would have sole access. In order to open the new account Gugle was required to execute a corporate authorization resolution. The document indicated that a meeting of the board of directors was held on January 29, 1996, and the board authorized the requested action. At trial, Gugle admitted that no meeting was ever held, as the only other member of the board was plaintiff, who was not consulted. Gugle further admitted that she unilaterally appointed a part-time employee as acting treasurer to replace plaintiff and had the employee sign the corporate authorization resolution as treasurer.

In February 1996, FNB began asking to review the corporate records. Gugle was unable to obtain any of the corporate records after plaintiff departed because of computer malfunction; the record does not indicate that the alleged problems were caused by plaintiff. Gugle did not obtain any of the corporation's records until March 1996.

On February 20, 1996, Gugle and Vasko attended a meeting at FNB, held in response to FNB's request to review the corporate records. Earl Grant, a representative from the SBA, was also in attendance. According to a letter Grant wrote following the meeting, Gugle made it known that she believed that the corporate account was missing money, though the basis for Gugle's belief was not disclosed. The meeting occurred before she had any access to the corporate records.

In a letter faxed on May 3, 1996 to Vasko, Schulte provided what purported to be a profit-and-loss estimate for An Elegant Encore for the year 1995, compiled from the corporate records Gugle gained access to in March. According to the

Schulte report, An Elegant Encore's books indicated a shortfall of $29,118. The report suggested that plaintiff should be asked to explain the shortfall. Having received a copy of the Schulte report from her mother, plaintiff stated that Schulte left an entire bank account out of his analysis, and she further pointed to multiple other errors in Schulte's analysis. Vasko was individually aware of many errors in the document, and he confirmed many of the errors plaintiff noted, including the exclusion of an entire corporate account.

In May 1996, defendants attended another meeting at FNB. Gugle, in the presence of Vasko, provided FNB with a copy of the Schulte report. Despite flaws contained in the Schulte report, and Vasko's awareness of them, Vasko did not inform FNB of the errors. Plaintiff contends that the Schulte report, and not the corporate records which Gugle by then had in her possession, was given to FNB to indicate that plaintiff had embezzled $29,000. Vasko testified that the bank no longer wanted the corporate records, despite Gugle's testimony that FNB was continually asking for them.

On June 17, 1996, at the request of Gugle, Vasko prepared and mailed a letter to the accounting firm of Taranto and Associates in response to a letter from the firm demanding payment for services rendered. Vasko's letter stated that the ongoing investigation into the corporate books and records indicated that plaintiff embezzled in excess of $30,000 from An Elegant Encore. While the letter does not indicate what documentation Vasko relied on to make that statement, Vasko testified at trial that he had based the number on the Schulte report and plaintiff's response.

On December 2, 1996, plaintiff filed a complaint against Gugle for wrongful termination and defamation. In an amended complaint, plaintiff added a claim of defamation against defendant Vasko. Trial commenced on April 18, 2000, and on April 20, 2000, the trial court granted defendants' motions for a directed verdict on all counts. Plaintiff appeals, assigning the following errors:

"I. The court abused its discretion in failing to disqualify appellee/defendant Vasko as attorney for appellee/co-defendant Gugle.

"II. The court erred in directing a verdict against appellant on her claim of wrongful termination.

"III. The court erred in directing a verdict against appellant on her claims of defamation against appellee Gugle and appellee Vasko.

"IV. The court erred in refusing to allow cross-examination of appellee Gugle regarding her own written statement that appellant embezzled company funds.

"V. The court erred in granting partial summary judgment to appellee Vasko where questions of fact remained as to the application of absolute privilege in the Jones and Lehman matters.

"VI. The court abused its discretion in overruling appellant's motion to add a party defendant and add a cause of action for defamation against that prospective defendant."

■ Plaintiff's first assignment of error contends that the trial court erred in refusing to disqualify defendant Vasko from acting as Gugle's attorney. In an admittedly unusual situation, Vasko served as counsel, witness and defendant. Although plaintiff contends that the trial court erred by refusing to disqualify Vasko, plaintiff never requested that Vasko be disqualified, nor did plaintiff indicate with any degree of specificity how Vasko's testimony would prejudice Gugle. See *Jackson v. Bellomy* (1995), 105 Ohio App.3d 341, 663 N.E.2d 1328. Nevertheless, at plaintiff's request, the trial court explicitly informed Gugle of the issues and asked if she wanted Vasko to continue to be her attorney. Gugle stated that she understood and wanted Vasko to continue as her attorney.

Vasko arguably could properly serve as Gugle's litigation counsel at the time plaintiff's complaint was filed, as the original complaint named only Gugle as a defendant and asserted only improper termination claims against Gugle. Once plaintiff's defamation claims were inserted into the lawsuit, Vasko assumed the additional roles of defendant and of potential witness, not only in connection with the defamation claim against Gugle, but those asserted against him as well. Therein lay the potential for prejudice to Gugle in Vasko's maintaining all three roles in the litigation. See DR 5–102(B).

■ "[I]n determining whether an attorney can continue to represent his client, the trial court is not deciding whether a violation of the Disciplinary Rules would have occurred. *Mentor Lagoons, Inc. v. Rubin* (1987), 31 Ohio St.3d 256, 31 OBR 459, 510 N.E.2d 379." *Jackson,* 105 Ohio App.3d at 346–347, 663 N.E.2d at 1331. Nonetheless, "a trial court has the inherent power to regulate the practice before it and protect the integrity of its proceedings, which includes the authority and duty to see to the ethical conduct of attorneys in proceedings. * * * This inherent power of the trial court also extends to situations where the question is not egregious misconduct of counsel but ethical considerations such as involved in *Mentor Lagoons* and the instant matter, which involves questions of whether counsel must withdraw when counsel will, or should, testify on behalf of the client, or will be called by the opposition to testify in the matter." *Id.*

■ According to *Jackson,* the trial court's obligation is this: " 'When an attorney representing a litigant in a pending case requests permission or is called to testify in that case, the court shall first determine the admissibility of the attorney's testimony without reference to DR 5–102(A). If the court finds that the testimony is admissible, then that attorney, opposing counsel, or the court *sua sponte,* may make a motion requesting the attorney to withdraw voluntarily

or be disqualified by the court from further representation in the case. The court must then consider whether any of the exceptions to DR 5–102 are applicable and, thus, whether the attorney may testify and continue to provide representation. In making these determinations, the court is not deciding whether a Disciplinary Rule will be violated, but rather preventing a potential violation of the Code of Professional Responsibility.'" *Id.*, 105 Ohio App.3d at 347, 663 N.E.2d at 1332 quoting *Mentor Lagoons,* paragraph two of the syllabus.

■ Despite the foregoing, the trial court did not inquire about the potential prejudice to Gugle, but only asked Gugle whether she wanted Vasko to continue to represent her. Given the parameters set forth in *Jackson,* the trial court erred in failing to explore the potential for prejudice more fully. See, also, *Mentor Lagoons, supra.* We recognize that plaintiff did not assist the court in any measurable degree, as she never filed a motion to disqualify Vasko. Nonetheless, plaintiff sufficiently brought the issue to the trial court's attention to prompt modest inquiry by the court. Moreover, had the trial court conducted the inquiry called for in *Jackson* and *Mentor Lagoons,* disqualification may have been necessary: "Where there is shown to be prejudice to a client in a given matter occasioned by the unprofessional activity of the client's legal counsel, it is not only the province, but the duty, of the trial court to take such action as necessary to abate the source of the prejudice." *Jackson,* 105 Ohio App.3d at 348, 663 N.E.2d at 1333. Accordingly, plaintiff's first assignment of error is sustained.

■ Plaintiff's second assignment of error contends that the trial court erred in directing a verdict on her claim of wrongful termination. An appellate court applies the same standard to an appeal challenging the propriety of a directed verdict that the trial court applies in the first instance. *Sheidler v. Norfolk & W. Ry.* (1999), 132 Ohio App.3d 462, 725 N.E.2d 351. "A motion for a *directed verdict* will be granted only 'after construing the evidence most strongly in favor of the party against whom the motion is directed' and finding 'that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party.'" (Emphasis sic.) *Swiggum v. Ameritech Corp.* (Sept. 30, 1999), Franklin App. No. 98AP–1031, unreported, 1999 WL 771022, quoting Civ.R. 50(A)(4); *O'Day v. Webb* (1972), 29 Ohio St.2d 215, 220, 58 O.O.2d 424, 427, 280 N.E.2d 896, 899–900.

■ Plaintiff claimed that she was wrongfully terminated. Generally, a wrongful termination claim has four elements. See *Greeley v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981. Plaintiff's cause of action, however, is distinct from the typical wrongful termination claim in that plaintiff was a shareholder, director, and employee of a closely held corporation. Ohio places a heightened fiduciary duty between majority and

minority shareholders in such a corporation. *Crosby v. Beam* (1989), 47 Ohio St.3d 105, 108, 548 N.E.2d 217, 220. "Majority or controlling shareholders breach such fiduciary duty to minority shareholders when control of close corporation is utilized to prevent minority from having an equal opportunity in the corporation." *Id.* at 109, 548 N.E.2d at 221. Such a breach, absent a legitimate business purpose, is actionable.

■ Although plaintiff and Gugle were equal shareholders, this court has imposed the heightened fiduciary duty in cases where the actors are equal shareholders. *McLaughlin v. Beeghly* (1992), 84 Ohio App.3d 502, 617 N.E.2d 703. The critical question is not whether one shareholder is a minority and the other a majority, but rather whether one owner so dominated the corporation that he or she can be said to have been in control to the exclusion of the other. *Id.*

■ Here, Gugle so dominated the corporation that the heightened fiduciary duty applies. Gugle, through counsel, denied plaintiff access to the business premises, business records, and the business checking account. See *McLaughlin, supra,* at 507, 617 N.E.2d at 705–706. In addition, by firing plaintiff Gugle deprived plaintiff of her salary, which frustrates plaintiff's purpose in the corporate venture. See *Wrightsel v. Ross–Co Redi–Mix, Inc.* (Mar. 26, 1993), Ross App. No. 1791, unreported, 1993 WL 97780. Moreover, according to Vasko's letter written to Taranto and Associates, Gugle expressly instructed that firm that its work was to be done with Gugle's knowledge and input, but to the exclusion of plaintiff. Those factors reflect that Gugle controlled the corporation to the exclusion of plaintiff. See *McLaughlin, supra,* at 507, 617 N.E.2d at 705–706.

■ The trial court concluded that plaintiff was an at-will employee and thus terminable at any time. In a closely held corporation, an employee-director-shareholder is not an at-will employee. *Gigax v.. Repka* (1992), 83 Ohio App.3d 615, 623, 615 N.E.2d 644, 649–650. The trial court further concluded that even if plaintiff was not an at-will employee, plaintiff's termination was not wrongful because there was a legitimate business reason for the termination. Not only did the trial court not state that reason, but the trial court's determination suggests that it weighed the evidence.

Viewed most strongly in favor of plaintiff, the evidence indicates that plaintiff's termination was not supported by a legitimate business reason. Approximately one month after An Elegant Encore opened its doors for business, Gugle met with Taylor. While the subject matter of the meeting is not entirely clear, Taylor's follow-up letter to Gugle indicated that Gugle could fire plaintiff pursuant to her powers as president and then gain control of the corporation through

the stock redemption agreement. In addition, Taylor cautioned Gugle that such a termination might be viewed unfavorably by a court because it was without cause and done only to seize control. Taylor's letter thus suggests that on some level the purpose of the meeting was to remove plaintiff from the corporation, and that Gugle did not have a legitimate business reason to do so.

Moreover, the Taylor letter recommended alternative courses of action. For example, the letter indicates that a mutually satisfactory buy-out of plaintiff's stock may have been a reasonable solution to Gugle's problems. The letter also recommended mediation. Indeed, Gugle offered plaintiff a buy-out before terminating her employment, and the issue of mediation was discussed, if not pursued. From those facts, a reasonable jury could conclude that Gugle followed Taylor's advice: Gugle tried to mediate and tried to negotiate a buy-out. When those options were unsuccessful, she fired plaintiff without cause.

Further, viewed again most strongly in favor of plaintiff, the evidence indicates that Gugle's proffered reasons for terminating plaintiff are internally inconsistent. Gugle claimed that she requested, through plaintiff's counsel, an explanation of the books and records, never received that explanation, and thus fired plaintiff. At the time plaintiff was terminated she did not have counsel. More importantly, the explanation was requested in response to the Schulte report, which was composed four months after plaintiff was terminated.

Gugle also testified that she terminated plaintiff because Gugle was unable to obtain any financial information about An Elegant Encore from plaintiff during plaintiff's employment. Specifically, Gugle testified that she was unable to obtain any access to the corporate records until March 1996, two months after plaintiff was terminated. Yet in a June 16, 1996 letter to Taranto and Associates, Gugle, through counsel, claimed that she informed the accounting firm, when it was hired in November 1995, that plaintiff had "made a shambles" of the corporate books. Gugle's knowledge that the corporate records were in "shambles" arguably is inconsistent with her claim that she had never seen the records. Moreover, Taranto and Associates worked on the books from November 1995 through plaintiff's termination and, in conjunction with the work, the evidence indicates that Gugle met with Taranto and Associates to review the books on several occasions.

At yet another point in her testimony, Gugle claimed that she fired plaintiff for failing to keep the books and records of An Elegant Encore. Yet Gugle repeated throughout her testimony that the first time she was able to view the corporate records was March 1996, approximately two months after plaintiff was fired. If Gugle did not see the corporate books until March 1996, then Gugle could not have known on January 29, 1996, when plaintiff was terminated, whether plaintiff properly kept the corporate books. Moreover, when Gugle printed the corporate

ledger from the computer in March 1996, she discovered that it was over three hundred seventy-nine pages long, suggesting a considerable amount of work was done.

The letter of termination indicated other grounds for plaintiff's termination. Specifically, it indicated that plaintiff was fired for breaches of corporate trust that occurred while plaintiff had access to the corporate credit cards and checking account. Although the letter does not specify the alleged breaches, when it is read in conjunction with the proposed buy-out offer, the "breaches" of corporate trust apparently referred to unauthorized use of the corporate credit cards and checking account. Gugle never introduced any such evidence at trial. Indeed, at one point, Vasko began to question plaintiff about using the corporation's American Express card to purchase tires for her car, but Vasko did not follow through with the question, and did not raise the issue again. Plaintiff, however, addressed the issue on direct, and explained that Gugle had authorized the purchase with the understanding that plaintiff would reimburse the corporation.

Although not explicitly mentioned in plaintiff's letter of termination, and raised by Gugle for the first time at trial as a reason for plaintiff's termination, defendants introduced evidence that plaintiff paid corporate bills untimely and that one corporate account was temporarily overdrawn. While such evidence may reflect a legitimate business reason for termination, the evidence is questionable, especially given the prior lack of mention: nine of the eleven "late payments" raised by defendants occurred within the month leading up to plaintiff's termination, and no evidence suggests that Gugle even was aware of the late accounts prior to terminating plaintiff's employment.

Even if the termination letter can be read broadly enough to encompass bills that were paid late, and assuming that Gugle, at the time plaintiff was terminated, was aware of bills paid late, the issue still should have gone to the jury. Plaintiff maintained that all bills were paid at the end of every month and, although some bills were technically late, no service was interrupted or terminated. In addition, plaintiff testified that some of the late bills were the result of plaintiff being out of town to attend a funeral, and therefore occurred on Gugle's watch. Moreover, according to plaintiff, the overdrawn corporate account was a "sweep" account the business used to deposit money, from which money routinely was swept into a different account. The overdraft, according to plaintiff, occurred because Gugle mistakenly forgot to make a certain deposit.

Given the inconsistencies in the testimony concerning plaintiff's termination, the trial court erred by directing a verdict in favor of defendants. Plaintiff's second assignment of error is sustained.

Plaintiff's third and fifth assignments of error are interrelated and will be addressed together. Plaintiffs third assignment of error contends that the trial court erred in directing a verdict in favor of defendants on plaintiff's claims of defamation. "Defamation is a false publication that injures a person's reputation, exposes him to public hatred, contempt, ridicule, shame or disgrace, or affects him adversely in his trade or business." *Sweitzer v. Outlet Communications, Inc.* (1999), 133 Ohio App.3d 102, 108, 726 N.E.2d 1084, 1088.

The trial court concluded that Gugle's allegedly defamatory statements were subject to a qualified privilege and/or substantially true. A qualified privilege is an affirmative defense to a claim of defamation. *Cooper v. Grace Baptist Church of Columbus, Ohio, Inc.* (1992), 81 Ohio App.3d 728, 734, 612 N.E.2d 357, 360–361; *Hahn v. Kotten* (1975), 43 Ohio St.2d 237, 243, 72 O.O.2d 134, 137–138, 331 N.E.2d 713, 718. Pursuant to Civ.R. 8(C), failure to raise such defenses in a responsive pleading or motion constitutes waiver. *Id.* Gugle did not raise the defense of qualified privilege in her answer, in any responsive pleading, or by motion. Nor was the issue tried by implied consent. Consequently, Gugle waived the defense of qualified privilege.

Moreover, with the evidence construed most strongly in plaintiff's favor, plaintiff presented sufficient evidence for a reasonable jury to conclude that Gugle's accusations of embezzlement were false. The accusations were fueled, if not initiated, by the Schulte report, which according to some of the evidence was unreliable at best. Indeed, Gugle was aware that Schulte had no special qualifications to produce such a report, and that Schulte's analysis neglected to include an entire corporate bank account.

In addition, Vasko noticed other significant errors with the report: (1) it considered assets as expenses, (2) it included sales tax figures as an expense of the company, and (3) it reported accounts payable as an expense of the company instead of a liability. In short, the report, which concluded plaintiff should be asked to explain a $29,118 shortfall in the corporate accounts, could be determined to be unreliable. Nevertheless, defendants provided the report to FNB in lieu of the corporate ledgers that FNB had been requesting for several months, even though defendants had access to the corporate ledger when they gave the Schulte report to FNB.

Further, plaintiff prepared a response to the allegations in the Schulte report, denying the accusations. Plaintiff also testified that no money was missing from the corporate accounts at the time of her termination. Her testimony alone created a factual issue to be resolved by the jury, not the trial judge.

Additional evidence of potential falsity is found in Gugle's testimony. Gugle testified that she informed the Ohio Bureau of Employment Services ("OBES")[1] that plaintiff was fired for cause: $50,000 worth of unaccounted-for receipts. Gugle testified moments later that when she appeared before OBES she had no idea of the value of the allegedly unaccounted-for receipts. Indeed, evidence that Gugle's statements were false can be inferred from the random nature of the alleged amount of the embezzlement, varying by thousands of dollars: over thirty thousand dollars, fifty thousand dollars, ten thousand dollars, and twenty thousand dollars.

Construed in plaintiff's favor, the evidence is sufficient for a jury to conclude that Gugle relied on the Schulte report to support her statements, the Schulte report was false, plaintiff's response to the Schulte report was truthful, and plaintiff did not embezzle any money.

■ With respect to Vasko the trial court concluded that (1) his statement was subject to a qualified privilege, and (2) the statement did not assert plaintiff was an embezzler. Vasko's statement occurred in a letter written to Thomas Strasser, the attorney for Taranto and Associates, who initiated contact with Vasko. Strasser was seeking payment for an outstanding debt that An Elegant Encore allegedly owed to Taranto and Associates. In replying to Strasser, Vasko stated, "I cannot emphasize enough that our ongoing investigation of the books and records of the company indicate [plaintiff] embezzled in excess of $30,000.00 from An Elegant Encore."

Vasko, like Gugle, failed to assert the affirmative defense of qualified privilege, and thus waived it. Moreover, contrary to the trial court's conclusion, Vasko's statement asserted that plaintiff was an embezzler; the trial court should not have granted a directed verdict on the basis that Vasko did not accuse plaintiff of being an embezzler.

■ On appeal, Vasko contends that his statement was protected by absolute privilege. Statements made "in a written pleading or brief, or in an oral statement to a judge or jury in open court, is absolutely privileged if it has some reasonable relation to the judicial proceeding in which it appears." *Michaels v. Berliner* (1997), 119 Ohio App.3d 82, 87, 694 N.E.2d 519, 522 (*"Michaels I"*). Within strict limitations, the privilege has been extended to extrajudicial communications, including communications between attorneys. See, generally, *Krakora v. Gold* (Sept. 28, 1999), Mahoning App. No. 98–CA–141, unreported, 1999 WL

---

1. Defendants did not raise application of absolute privilege arising from OBES proceedings, and thus we do not address it.

782758 (privilege extends also to extrajudicial communications preceding actual litigation if proceedings in the trial court are imminent).

Nonetheless, "the privilege 'does not give a person *carte blanche* to defame another on the mere condition that a judicial proceeding is mentioned in, or somehow connected to, the defamatory statement.'" *Michaels v. Berliner* (Feb. 7, 2001), Summit App. No. 20136, unreported, 2001 WL 111582 ("*Michaels II*"). Therefore, extrajudicial communications require greater scrutiny. *Michaels I, supra,* at 88, 694 N.E.2d at 522–523. In order for an extrajudicial communication to come within the cloak of absolute privilege it must be (1) made in the regular course of preparing for and conducting a proceeding that is contemplated in good faith and under serious consideration, (2) pertinent to the relief sought, and (3) published only to those directly interested in the proceeding. *Id.; Theiss v. Scherer* (C.A.6, 1968), 396 F.2d 646.

Here Strasser's threatened litigation was insufficient to bring the communication within "the regular course" of preparing for litigation. At best, the Strasser letter contained a vague threat of some future litigation if the matter was not resolved. Moreover, the defamatory comments did not concern the subject matter of the litigation. Cf. *Theiss, supra* (finding allegedly defamatory statements were privileged because they concerned the appointment of a trustee, and the pending litigation concerned a will contest); *Michaels I, supra* (finding letter concerning the potential disqualification of counsel on the ground of a conflict of interest was pertinent and material to the relief or redress sought). Unlike the statements at issue in *Theiss* and *Michaels I,* plaintiff's alleged embezzlement legally was irrelevant to possible future litigation between An Elegant Encore and Taranto and Associates, as embezzlement would not be a defense, even if it explained the failure to pay. Vasko's statement was not protected by absolute privilege.

Plaintiff's fifth assignment of error contends that the trial court erred in granting partial summary judgment to defendant Vasko where questions of fact remained regarding application of absolute privilege in the Jones and Lehman matters. Applicability of absolute privilege is a question of law. *Surace v. Wuliger* (1986), 25 Ohio St.3d 229, 231–232, 25 OBR 288, 290–291, 495 N.E.2d 939, 941–942; *Mauk v. Brundage* (1903), 68 Ohio St. 89, 67 N.E. 152. Alleged errors of law are reviewed *de novo. Ohio Bell Tel. Co. v. Pub. Util. Comm.* (1992), 64 Ohio St.3d 145, 147, 593 N.E.2d 286, 287.

The alleged defamatory statements at issue relate to conversations between Vasko and two of An Elegant Encore's consignors, Jones and Lehman, who claimed that they had never received payment from the sale of their consigned goods. Both ultimately filed suit against An Elegant Encore and later against

plaintiff. Plaintiff contends that Vasko informed Lehman and Jones that plaintiff had embezzled corporate monies. Vasko asserts that the statements were made during litigation between Gugle as president of An Elegant Encore, and the two consignors. Plaintiff counters that even if they were made during litigation, plaintiff's alleged embezzlement was irrelevant to the litigation.

Similar to Vasko's statements at issue in assignment of error three, Vasko's alleged statements are not protected by absolute privilege. The statements to Jones were made after Jones dismissed her claim against Gugle, and thus do not fall within the parameters of absolute privilege. The statements to Lehman were made in response to Lehman's request for the money owed him by An Elegant Encore. No litigation was pending at that time and litigation was not imminent. The statements thus were not subject to absolute privilege. Moreover, an alleged embezzlement by a former employee is not pertinent or material to the relief or redress sought in a claim by creditors for payment of a valid debt. For the foregoing reasons, plaintiff's third and fifth assignments of error are sustained.

Plaintiff's fourth assignment of error contends that the trial court erred in preventing plaintiff from cross-examining Gugle on certain written statements made in a police report completed by Gugle accusing plaintiff of embezzlement. The trial court concluded that the statements were protected by qualified privilege. Because Gugle, as noted, waived the defense of qualified privilege, the trial court erred in precluding cross-examination on that basis.

Moreover, even if Gugle's statements in the report are protected by qualified privilege, that only means that plaintiff must prove that the statements were made with actual malice to prevail on her defamation claim as it relates to the report. *Rolsen v. Lazarus, Inc.* (Sept. 29, 2000), Hamilton App. No. C–990588, unreported, 2000 WL 1434170; *Hahn, supra.* Plaintiff had the right to prove actual malice and thereby overcome the defense. In the event plaintiff failed to prove actual malice, plaintiff simply would have failed on her defamation claim as it relates to that document. Plaintiff's fourth assignment of error is sustained.

Plaintiff's sixth assignment of error asserts that the trial court erred in failing to allow plaintiff to file a third amended complaint. Plaintiff filed her original complaint on December 2, 1996, and was given leave to file an amended complaint on April 15, 1997. Plaintiff requested leave to file a second amended complaint on May 13, 1998. The trial court denied the motion, concluding that the amended complaint would prejudice the prospective and current defendants.

Pursuant to Civ.R. 15(A), leave to file an amended complaint shall be freely given. The proposed amended complaint, which sought to add new defendants as

well as new claims against existing defendants, was filed three months after the close of discovery. The trial court determined that plaintiff was not basing the new claims on any newly discovered evidence, and further concluded that the amendment would cause significant added expense and substantial delay to the prejudice of Gugle and the additional parties plaintiff sought to add. The trial court accurately analyzed the facts before it and did not abuse its discretion in denying the amendment so late in the proceedings and in the absence of an adequate reason for the tardiness of plaintiff's motion. Plaintiff's sixth assignment of error is overruled.

Having overruled plaintiff's sixth assignment of error, but having sustained plaintiff's first, second, third, fourth, and fifth assignments of error, we affirm in part and reverse in part the judgment of the trial court and remand this cause for further proceedings consistent with this opinion.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

LAZARUS and DESHLER, JJ., concur.