[Cite as *Hickerson v. Hickerson*, 2010-Ohio-4070.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

JAMES C. HICKERSON, ET AL.,

    PLAINTIFFS-APPELLEES,          CASE NO.  5-10-08

    v.

JAMES R. HICKERSON, ET AL.          O P I N I O N

    DEFENDANTS-APPELLANTS.

Appeal from Hancock County Common Pleas Court
Trial Court No. 2007-CV-741

**Judgment Affirmed**

**Date of Decision:   August 30, 2010**

APPEARANCES:

    *William E. Clark*  for Appellants

    *Timothy A. Magee*  for Appellees

**PRESTON, J.**

{¶1} Defendants-appellants, James R. Hickerson (hereinafter "Father") and Hickerson Excavating, Inc. (hereinafter "Hickerson Excavating" or "the company") (hereinafter collectively "the appellants"), appeal the Hancock County Court of Common Pleas' judgment, which found Father had breached his fiduciary duty to plaintiff-appellee, James C. Hickerson (hereinafter "Son"). For the reasons that follow, we affirm.

{¶2} This matter concerns the operations of a closely-held corporation, Hickerson Excavating, Inc., owned and operated by Father and Son. In particular, this appeal concerns Father's decision to terminate dividend payments to Son, which allegedly amounted to a breach of fiduciary duty.

{¶3} The general facts of this case are largely not in dispute. In 1982, Son started working for Father, who was involved in the excavating business in and around Hancock County. The two worked together under the d.b.a. of "Hickerson Excavating" from its inception. Eventually, the business was formally incorporated on October 28, 1999, when Father and Son executed a close corporation agreement. Under the terms of the close corporation agreement, Son had a twenty-percent (20%) ownership interest in Hickerson Excavating, and Father had an eighty-percent (80%) ownership interest in the company. Because

of their positions with the company, the parties received both weekly dividend[1] and salary payments.

{¶4} Soon after the company was incorporated, Son's wife, Toni Hickerson, started working for Hickerson Excavating, first as a secretary and then as the company's office manager. Also, later in 2003, Father and Son started a second business called "J and J Topsoil," which was an unincorporated d.b.a. and essentially operated as an informal 50/50 partnership, with the Hickersons splitting the profits equally. Eventually, Father decided to retire. As a result, he left Son in charge of the day-to-day operations of both of the businesses, and started spending six-to-seven months out of the year in Florida.

{¶5} There were no major problems between the parties or with their businesses until June 2007, when a dispute arose concerning Son's decision to settle a corporate lawsuit. The underlying facts of the corporate litigation are also not in dispute. Essentially, the city of Mt. Blanchard hired Hickerson Excavating to demolish a house. The owner of the house was allegedly incarcerated at the time Hickerson Excavating actually demolished the house. However, when the owner was released, he sued both the city and Hickerson Excavating claiming that

---

[1] We note that during the trial, both of the parties continuously referred to this money as a "dividend"; however, the company's accountant testified that while this money was reported as an S corp. dividend in the company's financial records, it technically went out as a profit distribution. The trial court noted the distinction in its judgment entry, but for ease of its discussion labeled this money as a "dividend," thus for purposes of our discussion, we will also refer to this amount of money as a "dividend," even though we recognize that it was technically considered a profit distribution.

one of the parties had stolen a lawn mower out of his shed, which had been on the property in question.

{¶6} At the time of the lawsuit, Father was in Florida, but specifically told Son not to settle because he did not want Hickerson Excavating to admit liability. Nevertheless, Son decided to settle the case and did not inform Father of his decision. Son claimed that his attorney had told him that the company would not be admitting liability by settling, and that it would end up costing the company more money to defend the action at trial than to settle. When Father returned from Florida in June of 2007, he discovered the company's attorney's bill, which listed the settlement offer paid by Hickerson Excavating.

{¶7} Upon discovering the bill, Father went out searching for Son, and eventually had Toni call Son on the phone so he could confront him about the settlement decision. At this point, there is conflicting testimony as to whether Son quit or Father fired Son;[2] nevertheless, neither party disputes that as a result of the settlement decision, an argument between the two parties ensued, and Son stopped working for the companies.

{¶8} Soon after this event, Toni separated from the companies, and Father took over the operation of the businesses. While Father's salary increased and Son

---

[2] The trial court found that as a result of the incident Son had quit and was not fired from the companies. (Nov. 23, 2009 JE).

stopped receiving a salary paycheck subsequent to Son's departure, both parties stopped receiving dividends.

{¶9} Consequently, Son and Toni filed suit against Father, Hickerson Excavating, Inc., and J and J Topsoil. In their complaint they alleged claims of breach of fiduciary duty, wrongful termination, conversion, fraud, and they asked for a court ordered accounting and dissolution. On December 22 and 23, 2008, the matter was tried to the court. Thereafter, on June 22, 2009, the trial court issued an oral decision, and upon a request by the appellants for findings of fact and conclusions of law, the trial court issued a written decision on November 23, 2009.

{¶10} Ultimately, in its decision, the trial court found in favor of Son with respect to his breach of fiduciary claim, and awarded him $12,500.00 (100 weeks at $125.00 per week), plus interest at the statutory rate from June 22, 2009. With respect to the remaining claims asserted by Toni and Son, the trial court found in favor of the appellants.

{¶11} The appellants, Father and Hickerson Excavating, now appeal and raise the following two assignments of error.[3]

## ASSIGNMENT OF ERROR NO. I

**THE TRIAL COURT ERRED AS A MATTER OF LAW BY RULING THAT OHIO DOES NOT RECOGNIZE A REDUCED FIDUCIARY DUTY TO A MINORITY SHAREHOLDER OF A CLOSE CORPORATION WHO**

---

[3] We note that Son filed a cross-appeal on March 17, 2010, but consequently withdrew his cross-appeal on June 14, 2010.

**ACQUIRED HIS MINORITY STATUS VIA A GIFT FROM A MAJORITY SHAREHOLDER**

{¶12} In their first assignment of error, the appellants argue that the trial court erred in applying the heightened fiduciary duty standard in this particular case. While they acknowledge that the heightened fiduciary duty standard is usually applicable in close corporation disputes, here the appellants claim that because Son obtained his minority interest in Hickerson Excavating by way of a gift from Father, the heightened fiduciary standard should not apply.

{¶13} In support of their position, the appellants point to a South Dakota Supreme Court case, *Mueller v. Cedar Shore Resort, Inc.* (S.D., 2002), 643 N.W.2d 56. This case held that there should be a lesser standard for breaches of fiduciary duties in close corporations where the minority shareholder receives their shares by gift or inheritance and does not invest any capital. *Mueller*, 643 N.W.2d at 64, 66-67. In those particular situations, the South Dakota Supreme Court held that the standard should be "somewhat lower, requiring only 'decent' conduct by controlling shareholders.'" Id. at 66-67. The appellants argue that because Son received his interest by way of a gift and did not contribute any capital investment, this Court should adopt the proposition that there is a lesser fiduciary standard owed to minority shareholders in close corporations who receive their interests from gifts or bequests. Nevertheless, despite the appellants' arguments, we find

that the proposition in *Mueller* is irrelevant in this particular case since it is clear that Son did not receive his 20% interest in the form of a gift from Father.

{¶14} "There are three general elements to a gift: (1) *intent* of the donor to make a gift, (2) *delivery* of the property to the donee, and (3) *acceptance* of the gift by the donee." *Citizens National Bank v. DeLuca* (Sept. 27, 2000), 3d Dist. No. 3-2000-12, at *3, citing *Barkley v. Barkley* (1997), 119 Ohio App.3d 155, 171 fn.2, 694 N.E.2d 989, citing *Bolles v. Toledo Trust Co.* (1936), 132 Ohio St. 21, 4 N.E.2d 917.

{¶15} At trial, Son testified that he and Father decided to incorporate the business because Father was getting ready to retire. (Dec. 22, 2008 Tr. at 174). As a result of the incorporation and Father's retirement, Son received a 20% interest in the company and was left "pretty much" running the company while Father was away in Florida six-to-seven months out of the year. (Id.). Moreover, Son stated that the original plan had been for him to receive an additional 5% of the company each year, which would relieve Father of the tax burdens and slowly turn everything over to Son. (Id. at 174-75). While Son never received the additional 5% interest each year nor did he contribute any initial capital when the company was incorporated, his job responsibilities increased to the point where he was eventually running the company. (Id. at 174-75, 198-99).

{¶16} With respect to Father's testimony, when asked about the ownership in Hickerson Excavating, he said that he considered himself to be the "sole owner" of Hickerson Excavating. (Dec. 22, 2008 Tr. at 14). However, Father later admitted that Son still possessed a 20% interest in the company, which Father said Son had received when the company was first incorporated. (Id.). Nevertheless, Father stated that despite Son's 20% ownership, he believed that Son was still not entitled to anything from the company because he had quit the business. (Id. at 39-40). Essentially, "if he didn't work, he is not entitled to" some of the benefits as a partial owner. (Id.).

{¶17} Based on the above evidence, we believe that, even though Son never paid money for his 20% interest, his interest was not the result of a gift. First of all, despite Father's argument that he had "gifted" 20% of the company to Son when the company was incorporated, Father never formally "gifted" any shares over to Son when the parties incorporated the business. Rather, after working so many years as a d.b.a. both parties agreed to formally incorporate the business, and executed a close corporation agreement. The agreement specifically delineated that Father owned 80% of the company, while Son owned 20% of the company. Thus, unlike the situation in *Mueller*, here Father never legally possessed 100% of the company's shares and then "gifted" 20% of the shares to

Son.  Rather, in this particular instance, Hickerson Excavating, Inc. started as 80-20 balance in ownership, and no formal transfer of shares ever took place.

{¶18} Second, it is clear that Son received his interest with the expectation that he would remain with the company and eventually take it over.  Son stated that he and his father decided to incorporate the business once Father decided that he wanted to retire.  As a result, Son and Father executed a close corporation agreement, Son received a 20% interest in the company, and Son essentially started running the company in Father's absence.  While there was never any written agreement that Son was supposed to receive an additional 5% of the company each year, it is undisputed that over the subsequent years Son became more in charge of the business, while Father spent more time in Florida.

{¶19} Even Father's testimony supports the finding that Son's interest in the company was not intended to be a gift.  He specifically stated that since Son was no longer working for the company, he was not entitled to receive anything from the company.  Consequently, then the only reason Son ever received any interest in the company was because he was expected to work and run the company for Father once he retired.  Contrast *Hobson v. Eaton* (C.A.Ohio, 1968), 19 Ohio Misc. 29, 399 F.2d 781, 784-85.

{¶20} Overall, because Son's 20% interest in Hickerson Excavating was not the result of a gift, we find it unnecessary to discuss the law concerning

minority shareholders who receive their interest from gifts that the appellants cite and rely on in this assignment of error.

{¶21} The appellants' first assignment of error is, therefore, overruled.

### ASSIGNMENT OF ERROR NO. II

**THE TRIAL COURT ERRED AS A MATTER OF LAW BY HOLDING THAT A MAJORITY SHAREHOLDER BREACHES HIS FIDUCIARY DUTY TO A MINORITY SHAREHOLDER WHEN THE MAJORITY SHAREHOLDER SUSPENDS DIVIDEND DISTRIBUTIONS FOR BOTH HIMSELF AND THE MINORITY SHAREHOLDER UPON LEARNING OF THE CORPORATION'S LACK OF SOLVENCY.**

{¶22} In their second assignment of error, the appellants argue that the trial court's finding that Father had breached his fiduciary duty to Son was in error. In particular, the appellants claim that regardless of whether this Court determines that he owed a heightened fiduciary duty to Son, a breach of fiduciary duty claim can be defeated when the majority shareholder acts with a legitimate business purpose. *Crosby v. Beam* (1989), 47 Ohio St.3d 105, 105, 548 N.E.2d 217, at paragraph two of the syllabus. See, also, *Morrison v. Gugle* (2001), 142 Ohio App.3d 244, 755 N.E.2d 404; *Priebe v. O'Malley* (1993), 89 Ohio App.3d 8, 623 N.E.2d 573. Here, they argue that there was enough evidence to find that Father's decision to terminate the dividend payment was based on a legitimate business purpose, which was the business' lack of solvency. As a result, they argue that the

trial court's finding that Father had breached his fiduciary duty to Son was essentially against the manifest weight of the evidence.

{¶23} In determining whether a judgment is against the manifest weight of the evidence, we cannot substitute our judgment for that of the trier of fact. The trier of fact is in a better position to observe the demeanor of the witnesses, examine the evidence, and weigh the credibility of the testimony and evidence. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273. Instead, we must determine whether the trier of fact's decision is supported by some competent, credible evidence going to all the essential elements of the case. Id.; *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 280, 376 N.E.2d 578. See, also, *Kelly v. Wellsville Foundry, Inc.* (Dec. 6, 2000), 7th Dist. No. 99-CO-27, at *6 (considering whether the trial court's finding that appellants had failed to demonstrate that they had had a legitimate business purposes for eliminating minority shareholders's interest was against the manifest weight of the evidence.)

{¶24} The elements for a breach of fiduciary duty claim are: "(1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom." *Werthmann v. DONet, Inc.,* 2d Dist. No. 20814, 2005-Ohio-3185, ¶42 (citations omitted).

- 11 -

**{¶25}** As the facts indicate, Hickerson Excavating is a close corporation, which is defined as an entity with "few shareholders and whose corporate shares are not generally traded on a securities market." *Tinter v. Lucik*, 172 Ohio App.3d 692, 2007-Ohio-4437, 876 N.E.2d 1026, ¶23. "[O]wnership of close corporations is 'limited to a small number of people who are dependent on each other for the enterprise to succeed.'" *Wheeler v. Johnson*, 2nd Dist. No. 22178, 2008-Ohio-2599, ¶24, quoting *Tinter*, 2007-Ohio-4437, at ¶23. Because of the nature of close corporations, it has been well recognized that majority shareholders owe minority shareholders a heightened fiduciary duty. *Thomas v. Fletcher*, 3d Dist. No. 17-05-31, 2006-Ohio-6685, ¶14. Essentially, shareholders in a close corporation owe each other a fiduciary duty to deal in utmost good faith. *Herbert v. Porter*, 165 Ohio App.3d 217, 2006-Ohio-355, 845 N.E.2d 574, ¶12. As the Ohio Supreme Court explained in *Crosby v. Beam*:

> **Close corporations bear a striking resemblance to a partnership. In essence, the ownership of a close corporation is limited to a small number of people who are dependent on each other for the enterprise to succeed. Just like a partnership, the relationship between the shareholders must be one of trust, confidence and loyalty if the close corporation is to thrive. While a close corporation provides the same benefits as do other corporations, such as limited liability and perpetuity, the close corporation structure also gives majority or controlling shareholders opportunities to oppress minority shareholders. For example, the majority or controlling shareholders may refuse to declare dividends, may grant majority shareholders-officers exorbitant salaries and bonuses, or pay high rent for property leased from the majority shareholders. *Donahue v. Rodd Electrotype Co. of***

> ***New England, Inc.* (1975), 367 Mass. 578, 588-589, 328 N.E.2d 505, 513.**

47 Ohio St.3d at 107-08 (footnote omitted). Therefore, whenever a majority shareholder uses their control of the corporation to obtain benefits that are not shared by the minority shareholder, the majority shareholder has breached their fiduciary duty to the minority shareholder. *Thomas*, 2006-Ohio-6685, ¶14, citing *Crosby*, 47 Ohio St.3d at 109, citing *Alaska Plastics, Inc. v. Coppock* (Alaska 1980), 621 P.2d 270. Absent a legitimate business purpose, such a breach is actionable. *Morrison*, 142 Ohio App.3d at 225.

{¶26} Here, with respect to the breach of fiduciary duty, in its judgment entry, the trial court found that based on the evidence presented, it was clear that "dividends were paid on a regular basis, irrespective of the company's profitability," and that Father's decision to terminate the dividends had been "punitive action taken against his son settling a company lawsuit against his express wishes and leaving employment." (Nov. 23, 2009 JE). Moreover, the trial court found that based on Father's testimony it was clear that Father did not "understand the important distinction between a shareholder and an employee." (Id.). As a result, the trial court ultimately concluded that "regardless as to how the transfer of stock was made to James C. Hickerson, James R. Hickerson's failure to continue to pay a 'dividend' to his son upon his separation from employment constitutes a breach of the heightened fiduciary duty owed to a

minority shareholder from a majority shareholder." (Nov. 23, 2009 JE, citing *Crosby v. Bean* (1989), 47 Ohio St.3d 105. See also, *Thomas v. Fletcher, et al.*, 2006-Ohio-6685).

{¶27} Nevertheless, the appellants claim that the reason Father terminated the payment of the dividends was because the company had become unprofitable by the time Son left and he took over. In fact, they point to the fact that upon learning of the company's financial situation, Father personally loaned $150,000.00 to Hickerson Excavating so that it could meet its ongoing obligations and operating expenses. Therefore, because of the financial situation with the company, corroborated by the fact that Father had to personally loan money to the company, there was a legitimate business purpose for terminating the dividend paychecks. However, after reviewing the record, we find that the trial court's decision is supported by competent, credible evidence and, thus, is not against the manifest weight of the evidence.

{¶28} First of all, it is clear that starting in 2004 and continuing up until Son left around June of 2007, Hickerson Excavating was paying dividends to Father and Son: in 2004, Father received $31,168.98, and Son received $7,792.25; in 2005, Father received $26,325.00, and Son received $6,500.00; in 2006, Father received $26,325.00, and Son received $6,500.00; and in 2007, Father received $13,500.00, and Son received $3,375.00. (Dec. 22, 2008 Tr. at 83-85); (Plaintiff's

Ex. 22). Father always received $500.00 a week, and Son always received $125.00 a week, which was consistent with their ownership interests in Hickerson Excavating. (Id. at 85). In addition, John Pinski, the company's accountant, testified that the last dividend checks were issued on July 7, 2007, and that there were no additional dividend checks made for the remainder of 2007 or for the entirety of 2008. (Dec. 22, 2008 Tr. at 79, 85). Moreover, Pinski acknowledged that before Son stopped working at the companies, the dividends had been paid consistently to both parties, and that from July 5, 2007, everyone stopped receiving dividends. (Id. at 112-13). Furthermore, his testimony reveals that dividends were consistently paid regardless of whether the company had suffered a loss for that particular year. (Id. at 122). For example, the company suffered losses in 2004 and 2007, and showed a profit in 2005 and 2006; nevertheless, in the years that the company suffered losses, the dividends were still paid weekly to the parties. (Id.). In particular, Pinski stated that the money for the dividends would come from the prior year's money or loans that the company had taken that current year. (Id. at 123).

{¶29} In addition, there is evidence indicating that Father's decision to terminate the dividends was punitive in nature and not based on a legitimate business purpose. Son and Toni testified that Father had been extremely upset when he discovered Son had decided to settle a lawsuit against the company over

his specific instructions not to settle the lawsuit. (Dec. 22, 2008 Tr. at 183-84, 216-18). Even though there was conflicting evidence as to whether Father fired Son over the incident, or whether Son quit in response to Father's reaction, the fact remains that soon after Son stopped working for the company, he stopped receiving not only a paycheck, but also a dividend check. While we acknowledge that Father also terminated his dividend payments as well as Son's dividend payments, up until Son stopped working for the company, Hickerson Excavating consistently paid the dividends regardless of whether the company was making a profit or not. Moreover, Father unilaterally made the decision to terminate the dividend payments after the incident with Son. In particular, Pinski testified that although he believed that the shareholders discussed the decisions regarding the distribution of the dividends, as of the date that Son stopped working for the company, Pinski said Father was making all of those decisions unilaterally, without holding a shareholder meeting or putting the issue to a vote. (Id. at 158).

{¶30} Furthermore, Father's own testimony at trial clearly establishes that his motive for terminating the dividend payments was punitive and not based on a legitimate business purpose. Father clearly believed that since Son was not working for the company, he was not entitled to anything from the company:

> **Q. I meant with your company?**
> **A. No, he hasn't made nothing with my company.**
> **Q. Why is that?**
> **A. He quit Hickerson Excavating.**

**Q. And isn't he a part owner of Hickerson Excavating?**
**A. Well, in a sense, yeah. I give him 20 percent of the company years ago, in an S corporation deal.**
**Q. And like you, isn't he entitled to some of the benefit as a partial owner?**
**A. Not if he don't work at it and he quits, he quit.**
**Q. So if he didn't work, he is not entitled, but if you don't work you are, is that your company? [sic]**
**A. That's right.**
**\* \* \***
**Q. You testified that as an owner you were entitled to money from the company whether or not you worked, correct?**
**A. I worked all my life to get this company going, and I should be given something out of it when I wanted to retire.**
**Q. So that's a yes?**
**A. Yes.**
**Q. And you also testified that your son even though he is a part owner isn't entitled to any money unless he works?**
**A. Exactly.**

(Dec. 22, 2008 Tr. at 39-42).

{¶31} Not only does this testimony illustrate that Father believed that Son was not entitled to anything from the company because he "quit," but it also clearly demonstrates that Father did not appreciate the difference between his son as an employee and his son as a part owner of Hickerson Excavating. Despite Father's opinion, even though Son was no longer working for the company, Son was still a partial owner by virtue of his 20% interest in the company. As a result of this interest and Son's shareholder status, Father still owed Son a duty to deal in the utmost good faith. However, because of the reasons he so adequately described above, Father failed to deal in the utmost good faith when he unilaterally

decided to terminate the parties' dividend payments. We note that we are not stating that Hickerson Excavating could never decide not to declare dividends. Father could have taken corporate action and declared a shareholder meeting, and thus could have put the issue of the dividends to a vote, which would have made the decision to terminate the dividends less punitive and more like a "legitimate business" decision. However, in this particular case, there is no evidence that Father took any formal corporate action in terminating the dividend payments. Essentially, the problem in this particular case is that Father clearly acted as an individual, or as a father who was upset with his son, instead of as a corporate officer making a rational business decision.

{¶32} Nevertheless, we acknowledge that there is evidence that Father did personally loan the company money when he took over the operations of the business in order to pay off the company's then existing debts and obligations, which, at a minimum, would suggest that Father may have had a legitimate business reason for terminating the dividend paychecks. However, as demonstrated by the evidence above, Father's decision to unilaterally terminate the dividends was clearly not based on a legitimate business purpose. Father was upset with Son about the unilateral settlement of a corporate litigation and for subsequently leaving the company, and he believed that if Son was not going to work for the company, then he should not receive anything from the company –

regardless of the fact that Son was still a partial owner. Therefore, we find that the trial court's decision is supported by competent, credible evidence, and, thus, is not against the manifest weight of the evidence.

{¶33} The appellants' second assignment of error is, therefore, overruled.

{¶34} Having found no error prejudicial to the appellants herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI, P.J. and SHAW, J., concur.**

**/jlr**