HEATON, Appellee,

v.

ROHL et al., Appellants.

[Cite as *Heaton v. Rohl*, 193 Ohio App.3d 770, 2011-Ohio-2090.]

Court of Appeals of Ohio,
Eleventh District, Lake County.

No. 2009–L–171.

Decided April 29, 2011.

772

Ziccarelli & Martello and Mark A. Ziccarelli, for appellee.

Svete & McGee Co., L.P.A., and David A. McGee, for appellants.

CYNTHIA WESTCOTT RICE, Judge.

{¶ 1} Appellants, Lawrence E. Rohl and All Aircraft Services, Inc. ("AAS"), appeal from the judgment of the Lake County Court of Common Pleas, adopting the findings of fact and conclusions of law of the special master commissioner ("SMC"), finding them jointly and severally liable to appellee, Robert J. Heaton in the amount of $135,878. For the reasons discussed in this opinion, we affirm the judgment of the trial court.

{¶ 2} The following facts, derived from the transcript of proceedings before the SMC, are germane to the issues before this court. Rohl has been involved in the aviation business for many years, both as a flight instructor and owner/operator of various general aviation-services companies. Overall, Rohl's companies own approximately 20 aircraft. One such company, T & G Flying Club ("T & G"), a corporation wholly owned by Rohl, has been in operation since 1977 and has locations at three airports in the Cleveland area: Cuyahoga County, Burke Lakefront, and Lost Nation. T & G manages personal aircraft owned by both Rohl's companies and others and provides various aviation services such as pilot services, flight lessons, and leasing aircraft. T & G also acts as an umbrella company to other entities relevant to this case.

{¶ 3} Lost Nation Aviation ("LNA"), through which T & G does business, is a fixed-base operation located at Lost Nation Airport. A fixed-base operation provides basic aviation services for the public, including basic aircraft maintenance, fueling, and hangar operations. Rohl created LNA in 1990, when T & G first began operations at Lost Nation Airport. At that time, T & G obtained a 20–year lease with the city of Willoughby to operate LNA out of Lost Nation Airport. After entering into the lease, Rohl, through T & G, incorporated Lost Nation Maintenance ("LNM"), which provided maintenance services primarily for T & G managed aircraft.

{¶ 4} Heaton worked for LNM as an aircraft mechanic from August 2001 through June 2002. During this time, Rohl and Heaton became friends and eventually decided to incorporate a new aircraft-maintenance company. To this end, they formed appellant AAS, a closely held corporation in which Rohl and Heaton each had an equal 50 percent share of the stock.

{¶ 5} Following the formation of AAS, Rohl, with the assistance of his attorney, drafted a series of written shareholder agreements. While there were many revisions and redrafts of the proposed agreement, none of the versions were ever

executed or signed by the parties. The parties could not agree on the details set forth in any proposal. Even though the parties had no valid shareholder agreement, they commenced operation of AAS as the sole directors of the company.

{¶ 6} Heaton served as president and vice president of the company, overseeing AAS's daily operations. Heaton was also an employee of the company, drawing a paycheck between $3,000 and $4,000 per month. Rohl acted as secretary and treasurer. Although he was not employed by AAS, Rohl was in the office regularly directing what he felt needed to be done.

{¶ 7} Prior to beginning operations, AAS required a cash infusion, which it received from T & G. AAS then took over all maintenance duties and services formerly conducted by LNM in the hangar leased by T & G. As a result, LNM was subsequently dissolved.

{¶ 8} The parties agreed to a discounted labor rate for T & G ($20 less per hour than the rate charged to its other clients), which, according to testimony, was used to offset expenses incurred by AAS, including rent and other overhead. During the entire 39–month period of AAS's operations, neither Rohl nor T & G made a written request or demand for rent or other costs of AAS's operations. And during the parties' business relationship, nothing indicates that Rohl ever verbally demanded rent or complained about back or future rent.

{¶ 9} After a year of operations, AAS was profitable and able to sustain itself financially, paying its employees as well as other necessary expenses. AAS also paid back to T & G the initial cash advance. All profits earned by AAS were evenly distributed between appellant and appellee at the end of each year. During AAS's 39 months of operations, the parties evenly split approximately $100,000 of shareholder distributions.

{¶ 10} AAS was a stable and profitable company until mid–2005. At that time, one of Rohl's partners in a separate business, Derby Air, damaged the engine of an Echo Whisky, an aircraft owned by Derby Air and managed by T & G. Because of the complicated nature of the damage, AAS was unable to independently make the necessary repairs. Accordingly, at Rohl's behest, AAS contacted an outside company, Standard Aero, to rebuild the engine. AAS, however, remained involved in the repair process as the distributor of parts to Standard Aero. According to Heaton, Rohl instructed AAS to bill Standard Aero at a nondiscounted retail rate.[1]

---

1. According to Rohl, the cost of the repair was approximately $235,000, of which his partner in Derby Air who damaged the plane paid $231,000.

{¶ 11} In September 2005, after the aircraft was repaired, Standard Aero sent a check to AAS for approximately $30,000, the profit from the sale of parts on the Echo Whisky job. Prior to receiving the check, Rohl met with Heaton and explained that, instead of placing the money in AAS's account, Rohl intended to keep the profit to paint the repaired Echo Whiskey. According to Heaton, Rohl justified his position by pointing out that Heaton was not entitled to the money, because "[Heaton] didn't hit home runs like that, he did, and [Heaton] don't make that kind of money." Although it was established that the $30,000 profit was sizeable, Heaton told Rohl that neither he nor Rohl was entitled to the money because it belonged to AAS. Over Rohl's objection, Standard Aero paid AAS, and Heaton deposited the money into AAS's checking account.

{¶ 12} After this disagreement, the relationship between the parties quickly deteriorated. On October 6, 2005, Rohl, in his capacity as president of T & G Flying Club, sent a letter to Heaton demanding that AAS pay rent to T & G for the period of January 1, 2003, through September 30, 2005. In his letter, Rohl warned Heaton that "[i]f payment of these rents is not received * * * Lost Nation Aviation will be forced to disallow any further maintenance at the facility by All Aircraft Services." Heaton did not respond to Rohl's letter and continued conducting AAS's business.

{¶ 13} Next, on October 17, 2005, Rohl, in his capacity as secretary/treasurer of AAS, unilaterally sent letters to all AAS's employees, with the exception of Heaton, declaring:

{¶ 14} "Effective October 16, 2005, All Aircraft Services, Inc. will no longer operate out of the Lost Nation Aviation hangar which is leased by T & G Flying Club, Inc. from the City of Willoughby.

{¶ 15} "As such, you will now be working for Lost Nation Aviation and future pay checks will come from T & G Flying Club, Inc., d.b.a. Lost Nation Aviation.

{¶ 16} "I will sit down with you and review your compensation as it has been and present a future plan which might benefit both yourself and the company.

{¶ 17} "All Aircraft Services has not been able to pay for the phones they use, the office and hangar space they consume, the shop equipment they use plus other liabilities."

{¶ 18} Heaton testified that Rohl did not apprise him of, let alone discuss with him, the arrangements proposed in the October 17 letter.

{¶ 19} Finally, on October 26, 2005, Rohl sent a letter objecting to the payment of Heaton's salary and health benefits. He also claimed, pursuant to his calculations, that AAS was in debt to LNA for "nearly $90,000" in back rent, among other things. Also, Rohl again demanded the $30,000 profit that AAS had earned from the repair of the Echo Whiskey aircraft. Although AAS's primary

means of achieving a profit was maintaining T & G-managed aircraft, Rohl's letter incongruously asserted: "As you know, All Aircraft Services, Inc., is not to make a profit off large ticket items which are purchased for aircraft operated by T & G Flying Club, Inc." Rohl further referred to an alleged "long-standing agreement" between the parties in which Heaton, at some unknown time, agreed that any profits from the Echo Whiskey job would be channeled to Derby Air, L.L.C., another company in which Rohl had an ownership interest.

{¶ 20} AAS subsequently ceased operations. Rohl, however, continued operating the same type of business as AAS, from the same facility, using the same employees, and assisting the same customers as AAS.

{¶ 21} On June 16, 2006, Heaton filed his complaint against Rohl and AAS, alleging that Rohl had (1) solicited and taken away customers and business from Heaton, (2) expended corporate assets for personal gain or the gain of other businesses in which Rohl has an interest, and (3) failed to work with AAS and has continued to operate in a divisive manner with AAS's employees, its customers, and its assets.

{¶ 22} Rohl denied the allegations and filed a counterclaim, alleging that Heaton had breached corporate agreements by failing to pay corporate expenses, misappropriated corporate funds and receivables for personal use, and breached his fiduciary duties as a corporate officer. The SMC was appointed, and the matter was tried over the course of five days. On February 4, 2009, upon the conclusion of trial, the SMC issued his findings of fact and conclusions of law. After a lengthy recitation of the facts adduced at trial, the SMC concluded, based upon the details set forth in letters of October 6, 17, and 26, that Rohl's actions had been "unreasonable and unjustified" and had caused Heaton damage. The SMC further concluded that Rohl had solicited customers and business for his own benefit and, by virtue of his actions in October 2005, breached his fiduciary duties to Heaton as well as AAS. The SMC also determined that Heaton had been denied the opportunity to continue employment and ownership of AAS by Rohl's actions.

{¶ 23} As a result of his legal conclusions, the SMC awarded Heaton the following damages: one-half of receivables received by Rohl, to wit, $13,628; one-half of the existing inventory, the reasonable value of which the SMC determined was $18,250; reasonable income lost for 18 months at $3,000 per month, to wit, $51,000;[2] one-half of the value of AAS, determined by the profit generated during its operation, to wit, $50,000; and one-half of the value of the equipment, the reasonable value of which the SMC determined was $3,000. The SMC

---

2. Although an income of $3,000 per month over 18 months is $54,000, the SMC awarded Heaton $51,000.

accordingly entered judgment against Rohl and AAS, jointly and severally, for damages in the amount of $135,878. The SMC also ordered Rohl, as sole custodian of AAS's books and records, to dissolve the corporation.

{¶ 24} On June 3, 2009, Rohl filed objections to both the SMC's factual findings and his conclusions of law. On August 11, 2009, Heaton filed a memorandum in response to Rohl's objections. Finally, on November 19, 2009, the trial court entered judgment adopting the SMC's factual findings in their entirety; the trial court further partially adopted the SMC's legal conclusions, ruling that Rohl had breached the fiduciary duty he owed to Heaton as well as an implied contract he had entered into with Heaton. Based upon these legal conclusions, the trial court adopted the SMC's damage calculation.

{¶ 25} Rohl now appeals and assigns two errors for our review. For his first assigned error, Rohl states:

{¶ 26} "The trial court erred in awarding damages of claimed value of corporation (based upon past income and without competent, credible evidence) and future lost income where employer corporation, AAS, had no source of income, continued viability, nor value beyond work performed for another corporation, T & G and its subsidiaries, which was wholly owned by defendant, Rohl, which was free to and, in fact, did cease providing work to AAS."

{¶ 27} Under this assignment of error, Rohl first argues that the trial court erred in adopting the SMC's decision to the extent the latter's determination relating to the value of AAS was not premised upon relevant, competent, and credible evidence. With respect to the value of the company, Rohl asserts that the SMC did not have the benefit of an expert to assign an actual value to AAS and did not use a standardized method in arriving at the value. Because the valuation was simply arbitrary and speculative, Rohl argues, the trial court abused its discretion in accepting the SMC's decision on the company's value.

{¶ 28} Preliminarily, although Rohl filed lengthy objections to the SMC's findings of fact and conclusions of law, he did not challenge the source of or manner in which the SMC arrived at his valuation of the corporation. Rohl did challenge the admissibility of Heaton's speculations about the value of AAS; however, the SMC did not use Heaton's estimate as a basis for his valuation. As discussed above, prior to trial, the parties agreed that they would be bound by the decision of the SMC, subject to review and approval by the court, pursuant to Civ.R. 53. Civ.R. 53(D)(3)(b)(iv) provides:

{¶ 29} "Waiver of right to assign adoption by court as error on appeal. Except for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii),

unless the party has objected to that finding or conclusion as required by Civ.R. 53(D)(3)(b)."

{¶ 30} In *Goldfuss v. Davidson* (1997), 79 Ohio St.3d 116, 679 N.E.2d 1099, syllabus, the Supreme Court of Ohio held:

{¶ 31} "In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself."

{¶ 32} With this highly deferential standard of review in mind, we turn to the merits of Rohl's assignment of error.

{¶ 33} In his decision, the SMC determined that AAS was worth $100,000 based upon the profits the company realized during its 39–month existence. Because the parties each owned 50 percent of the company, the SMC concluded that Heaton was entitled to $50,000. During his case-in-chief, Heaton introduced AAS's federal income tax returns for the years 2002 through 2005 as well as quarterly financial statements for the years 2003 through 2005. These documents, which reflected AAS's profits, were prepared by AAS's accountant Michael H. Forrey. Although Forrey testified that he did not appraise businesses, he stated that the documents he prepared could be helpful in valuing a business.

{¶ 34} Rohl takes issue with the SMC's valuation of AAS, arguing that a credible determination of the value of the company could not be made without the assistance of an expert. We do not agree.

{¶ 35} While expert testimony based upon authoritative sources may be preferable in establishing the value of stock shares in a closely held corporation, such testimony is not the only way of establishing the value. *Maloof v. Maloof* (Mar. 17, 1988), 8th Dist. No. 53377, 1988 WL 32127, *5. Indeed, the court in *Maloof* held that accountant-prepared tax returns are sufficient evidence to allow a court to determine a closely held business's value. Id. at *5–6.

{¶ 36} The SMC in the present case had AAS's tax returns, financial statements, and Forrey's testimony to aid him in his calculation. These items provided a legally adequate basis upon which the SMC could premise his conclusion regarding AAS's value. Absent other evidence that could have assisted the court in drawing a more precise conclusion, we hold that the SMC did not err in relying on the evidence admitted at trial, including the accountant-prepared federal tax returns, to establish the value of the business.

{¶ 37} Rohl further argues that the SMC failed to explain how he arrived at the $100,000 amount. But the SMC stated in his decision that the figure

represented the profits that AAS enjoyed over the 39 months during which it was functioning. Although the profits of a company do not necessarily represent the actual value of the company, Rohl did not offer a separate, competing method of computing the value. Rohl, on direct examination, could have submitted evidence of what he believed AAS was worth at the time it ceased operation, or he could have challenged the method and amount by objecting to the SMC's report in his objections. He did not do so. Even assuming that the SMC erred in his method of valuing AAS, we do not believe that this error affected the fundamental fairness of the proceedings. Thus, the trial court's adoption of the SMC's valuation does not represent plain error.

{¶ 38} Rohl next argues that the trial court erred in adopting the SMC's decision as it relates to damages for Heaton's lost income because, he alleges, the SMC's ruling is not supported by law or the facts. As this issue was raised in Rohl's objections to the SMC's decision, we must set forth our standard of review.

{¶ 39} During the pretrial phase, the parties jointly requested that the matter be referred to an SMC "selected by mutual agreement of the parties" but "subject to the parameters for review and approval by the court as required under * * * Civil Rule 53." [3] The trial court granted the parties' request. As an appellate court reviews a trial court's adoption of a decision filed pursuant to Civ.R. 53 for an abuse of discretion, see, e.g., *Grein v. Grein*, 11th Dist. No.2009–L–145, 2010-Ohio-2681, 2010 WL 2349599, at ¶ 23, it is under this standard that we will proceed with our analysis.

{¶ 40} In adopting the SMC's decision to award lost income to Heaton, the trial court determined that as a result of Rohl's breach of implied contract, Heaton was entitled to "[r]easonable income lost * * * for 18 months at $3,000.00 per month or $51,000." Rohl acknowledges that lost future income is an available remedy for a breach of contract. He disputes, however, the basis of the award because, he alleges, Heaton never pleaded or proved a breach of contract.

{¶ 41} With respect to the first argument, Rohl, in his counterclaim, alleged that Heaton had breached certain corporate agreements by "fail[ing] to pay corporate expenses, or fail[ing] to cause those expenses to be paid," i.e., rent and overhead. Rohl placed the contractual issue before the court and, as a result, bore the burden of an unfavorable ruling.

{¶ 42} With this in mind, at trial, in an effort to establish the nature of the parties' business relationship (as well as prove his allegations and defend against

---

3. Proceedings before an SMC are not expressly governed by Civ.R. 53. Because, however, the parties agreed to have the trial court review the SMC's decision under this rule and the trial court entered an order adopting this agreement, we will review the trial court's judgment accordingly.

Rohl's), Heaton testified at length that upon incorporating AAS, the parties established an arrangement whereby AAS would provide discounted work to T & G-managed aircraft in exchange for its use of the hangar that T & G leased from the city of Willoughby. Rohl disputed this, essentially claiming that AAS was always required to pay rent; and that T & G had simply not attempted to enforce this requirement until October 2005.

{¶ 43} After hearing the evidence, the SMC found Heaton's testimony more credible, ruling in his favor. Rohl subsequently filed objections to the SMC's decision. One objection pertained to the SMC's failure to find Heaton in breach of contract for failing to pay rent and expenses. In addressing the issue, the trial court reviewed the evidence de novo, overruled Rohl's objection, and found, as a matter of law, that Rohl had breached the parties' implied contract by demanding rent payments and expenses. Clearly, even though Heaton did not formally allege that Rohl was in breach, Rohl insisted that the court rule on the issue and, in doing so, invited the court to rule in Heaton's favor on the issue. Rohl's argument is therefore overruled.

{¶ 44} Next, Rohl claims that even if the breach-of-contract issue was properly before the court, Heaton failed to offer evidence sufficient to prove a breach. As a result, Heaton was not entitled to damages for lost income. In support, Rohl points out that he and Heaton never had an agreement as to how long AAS would continue to operate and, thus, Heaton had no expectation of future employment. We believe that Rohl's assertion is irrelevant to whether Heaton is entitled to compensation for lost income.

{¶ 45} In the judgment entry adopting the SMC's decision, the trial court found: "[Heaton] contends that the parties agreed that AAS would bill T & G Flying Club at a discounted labor rate for all work it performed for T & G. In return, T & G would not bill AAS for rent and office expenses. The defendants heatedly deny this, but * * * the SMC found [Heaton's] testimony to be credible, and so does this court. It is undisputed that for nearly three years, Rohl never made a written demand for rent from AAS. It also appears that there was never any serious dispute about Heaton receiving a salary and paid health care during that period. Thus, the court finds that for approximately three years, the course of dealing between the parties proves that they reached a meeting of the minds over corporate expenses. Rohl breached the party's [sic] implied contract by demanding rent payments from AAS and the return of salary and health expenses from Heaton."

{¶ 46} The trial court's findings are supported by the evidence adduced at trial. Even though there was no agreement regarding how long AAS would remain in business or any long-term arrangements relating to Heaton's status as a paid employee of the company, this does not legally absolve Rohl for the actions he

took in October 2005. As a result of these actions, Heaton was left unemployed for approximately 18 months and AAS ceased operations and eventually dissolved. Nothing in the record indicates that those events would have occurred if Rohl had not breached the implied contract established by the parties' conduct between April 2002 and September 2005.

{¶ 47} Rohl and Heaton were the only directors, officers, and shareholders of AAS. As a director, Rohl owed a fiduciary duty to both the corporation and his coshareholder. *Thompson v. Cent. Ohio Cellular, Inc.* (1994), 93 Ohio App.3d 530, 540, 639 N.E.2d 462. One aspect of Rohl's fiduciary duty as a director required him to refrain from self-dealing. *Wing Leasing, Inc. v. M & B Aviation, Inc.* (1988), 44 Ohio App.3d 178, 181, 542 N.E.2d 671; see also R.C. 1701.59(B) and 1701.60(A)(1). "A breach of this duty exposes the director to liability for damages where clear and convincing evidence establishes that the director acted with deliberate intent to cause injury to the corporation or recklessly disregarded the corporation's best interests." *Morgan v. Ramby*, 12th Dist. No. CA2007–12–147, 2008-Ohio-6194, 2008 WL 5052777, at ¶ 22; citing R.C. 1701.59(D).

{¶ 48} Rohl was not obligated to allow AAS to remain at the facility leased by Lost Nation Aviation, nor was he obligated to channel maintenance work from T & G to AAS. Nevertheless, as a director of AAS, he had an affirmative fiduciary duty to refrain from acting in a way that would benefit himself at the expense of the corporation and its other shareholder. Rohl's actions in October 2005 demonstrate that he breached this duty and, in doing so, subjected himself to liability.

{¶ 49} Rohl's first assignment of error is overruled.

{¶ 50} Rohl's second assignment of error asserts:

{¶ 51} "The trial court, upon finding that neither fact nor law permitted plaintiff to pierce the corporate veil, erred in awarding direct damages to the individual and equal shareholder Heaton, against the individual and equal shareholder Rohl, upon the derivative claims (neither pled nor prosecuted) of inventory, equipment and receivables due the defendant corporation, AAS."

{¶ 52} Under his second assignment of error, Rohl asserts that the trial court erred when it concluded that Heaton's lawsuit was properly filed as a direct action. Rohl claims that a suit attempting to hold a director or shareholder of a company liable for causing harm to another shareholder must be brought as a derivative action pursuant to Civ.R. 23.1. Because Heaton did not file a derivative suit, Rohl asserts that he cannot be held liable for the damages pertaining to the assets that were exclusively the property of AAS, to wit, the inventory ($18,250), receivables ($13,628), and equipment ($3,000).

{¶ 53} Initially, it appears that this legal issue was raised for the first time in Rohl's objections to the SMC's decision, filed June 3, 2009. As it is a legal issue upon which only the trial court ruled, we will review the issue de novo. *Sibera v. Kordes*, 11th Dist. No. 2009–T–0129, 2010-Ohio-6574, 2010 WL 5622059, at ¶ 32. Before evaluating Rohl's argument, it is necessary to highlight some salient principles of Ohio's corporate law that are germane to this case.

{¶ 54} As pointed out above, AAS was a close corporation. A close corporation is an entity with relatively few shareholders, whose shares are not generally traded on the securities market. *Crosby v. Beam* (1989), 47 Ohio St.3d 105, 107, 548 N.E.2d 217. The shareholders in a closely held corporation owe one another a fiduciary duty to act in good faith and refrain from self-dealing. Id. at 107–108, 548 N.E.2d 217; see also *Herbert v. Porter*, 165 Ohio App.3d 217, 2006-Ohio-355, 845 N.E.2d 574, ¶ 12; *Provac Plant Servs. v. Glass* (June 28, 2000), 7th Dist. No. 99 CO 40, 2000 WL 875355, *2–3. Moreover, Ohio imposes a heightened fiduciary duty upon majority shareholders in a close corporation. *Crosby* at 108, 548 N.E.2d 217. Further, in circumstances in which corporate owners are equal shareholders, a heightened fiduciary duty may arise when "one owner so dominated the corporation that he or she can be said to have been in control to the exclusion of the other." *Morrison v. Gugle* (2001), 142 Ohio App.3d 244, 255, 755 N.E.2d 404, citing *McLaughlin v. Beeghly* (1992), 84 Ohio App.3d 502, 617 N.E.2d 703.

{¶ 55} In this case, Heaton, as a shareholder of AAS, brought a direct action against Rohl for damages allegedly caused by Rohl when acting in his capacity as director or officer of AAS. Usually, a director's breach of a fiduciary duty is understood to harm the corporation, and as a result, any resulting damages inure to the corporation. *Morgan*, 2008-Ohio-6194, 2008 WL 5052777, at ¶ 23, citing *Grand Council of Ohio v. Owens* (1993), 86 Ohio App.3d 215, 220–221, 620 N.E.2d 234. Under such circumstances, a plaintiff-shareholder is generally required to bring a derivative action, i.e., a lawsuit on behalf of the corporation. A shareholder, however, may bring a direct action against a director or officer for injuries suffered by the corporation where (1) the injury arises out of a special duty, e.g., via contract, between the wrongdoer and the shareholder, or (2) the shareholder suffered damages separate and distinct from that suffered by other shareholders. *Morgan*, citing *Hershman's, Inc. v. Sachs–Dolmar Div.* (1993), 89 Ohio App.3d 74, 77, 623 N.E.2d 617.

{¶ 56} In the present case, the trial court ruled that Heaton properly brought a direct action against Rohl because he suffered damages separate and distinct from Rohl when, in October 2005, Rohl, through T & G, unilaterally caused AAS to cease operations. We agree with the trial court's conclusion.

{¶ 57} Although Rohl and Heaton were equal shareholders, AAS was not a typical corporation. Corporate formalities were largely disregarded. There was no shareholder agreement and there was no evidence that any shareholder meetings ever actually occurred. Corporate papers and other business records were disorganized and, many times, incomplete. Although each party was a director and they functioned as officers, these titles were seemingly nominal designations imposed by the articles of incorporation. Finally, even though Heaton oversaw AAS's day-to-day functions, Rohl, as the sole owner of the company that held the lease over the hangar in which AAS conducted its operations, possessed unique, supervening control over AAS, which, in October 2005, he aggressively exercised.

{¶ 58} During that month, Rohl, through T & G, breached an implied contract regarding the parties' previous rental arrangement by demanding over $90,000 in back rent and overhead costs, which, given the parties' course of conduct, had never been negotiated or requested. Rohl, again through T & G, d.b.a. LNA, then systematically took over AAS's remaining employees and the entirety of the work AAS formerly performed as well as the clientele that AAS formerly served. His actions, however, precluded Heaton from having an equal opportunity to manage or benefit from the corporation and, indeed, led to the eventual dissolution of AAS.

{¶ 59} From these facts, the trial court correctly concluded that Rohl had breached heightened fiduciary duties to act in good faith and refrain from self-dealing. Rohl's actions deprived Heaton, the sole remaining shareholder, of both his equal share in the company and his employment. Rohl, on the other hand, was able to continue operating a business engaged in the same operations as AAS, in the same location, with the same employees, assisting the same customers. Not only was Rohl, as the only other shareholder of AAS, left undamaged by his own actions, he actually profited at the expense of AAS and Heaton. We therefore hold that the trial court was correct in concluding that Rohl's acts caused Heaton to suffer injuries separate and distinct from any injury Rohl arguably suffered when AAS ceased operations. The cause of action was appropriately brought as a direct action against Rohl, and, as a result, the trial court correctly held Rohl and AAS jointly liable for the damages at issue.

{¶ 60} Appellant's second assignment of error lacks merit.

{¶ 61} For the reasons discussed above, Rohl's two assignments of error lack merit, and the judgment of the Lake County Court of Common Pleas is hereby affirmed.

Judgment affirmed.

CANNON, P.J., and GRENDELL, J., concur.