[Cite as *W. 6th St. Partners, Inc. v. Culkar*, 2026-Ohio-1654.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

WEST 6TH ST. PARTNERS, INC., :
ET AL., :

      Plaintiffs-Appellants/ :
      Cross-Appellees,

       :     No. 115527

      v. :

THOMAS CULKAR, :

      Defendant-Appellee/ :
      Cross-Appellants. :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, REVERSED IN
             PART AND REMANDED
**RELEASED AND JOURNALIZED:** May 7, 2026

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-22-964233

---

### *Appearances:*

Byron Legal, LLC and Evan T. Byron, *for appellants/cross-appellees.*

Randy J. Hart and Kevin J. Brennan, *for appellee/cross-appellant.*

EILEEN A. GALLAGHER, J.:

{¶ 1}   Appellants/cross-appellees West 6th St. Partners, Inc. ("West 6th"), Russell Koz ("Koz"), Alexsandrea Mann and appellee/cross-appellant, Thomas Culkar ("Culkar") appeal the trial court's granting of opposing motions for directed verdicts. For the reasons that follow, we affirm in part, reverse in part, and remand this matter for further proceedings.

**Facts and Procedural History**

{¶ 2}   This case involves a shareholder disagreement over the operation and management of cash funds from West 6th doing business as the Velvet Dog ("the business" or "the company"), a nightclub that operated in downtown Cleveland's Warehouse District. West 6th was incorporated in 1997 with five equal shareholders: Culkar, Joseph Mann ("Mann"), Joseph Hanna ("Hanna"), Frank Winters ("Winters"), and Koz. Each partner owned 20 percent of the outstanding shares.

{¶ 3}   Culkar was the manager of the business overseeing the day-to-day operations and handling the cash deposits. In 2013, the four other partners accused Culkar of misappropriating cash from the business. To resolve this dispute without litigation, the partners entered into a contract ("Standstill Agreement") where they agreed that accountant Douglas Langshaw would review the company's records and write a report concluding whether anyone misappropriated funds. The parties further agreed in the Standstill Agreement to be bound by his conclusions.

Langshaw released his Special Report ("report") on January 27, 2015. No payments were made by any partner as a result of the Standstill Agreement.

{¶ 4} In 2018, West 6th along with partners Mann and Koz (collectively "West 6th Parties") filed a lawsuit against Culkar alleging claims for declaratory judgment, breach of contract, breach of fiduciary duty, misappropriation of funds, unjust enrichment and money had and received.[1] In 2022, the West 6th Parties filed a Civ.R. 41(A) dismissal and the case was dismissed without prejudice. On June 2, 2022, the case was refiled in Cuyahoga C.P. No. CV-22-964233, which is the case underlying this appeal. The parties and claims in the second case were the same as in the first complaint except that, as Mann had died, the Estate of Joseph Mann was substituted.

{¶ 5} On August 23, 2022, Culkar filed an answer and a counterclaim alleging conversion of his shares of West 6th by the other partners.

{¶ 6} On February 27, 2024, the West 6th Parties filed an amended complaint substituting the Estate of Mann with appellant/cross-appellee Alexsandrea Mann, the wife of Mann who had inherited his shares in West 6th.

{¶ 7} On May 1, 2024, Culkar filed an amended answer and counterclaims for declaratory judgment, conversion and unjust enrichment against the West 6th Parties.

---

[1] Cuyahoga C.P. No. CV-18-900490.

{¶ 8} On August 6, 2025, a hearing was held on both parties' claims for declaratory relief. The court declined to declare judgment for either party denying the claims and ordering the parties to proceed to trial on all other issues.

{¶ 9} Trial continued and, on August 6, 2025, the West 6th Parties rested and Culkar moved for a directed verdict on all of West 6th Parties' remaining claims. The court granted this motion.

{¶ 10} On August 7, 2025, Culkar presented evidence for his counterclaims. After he rested, the West 6th Parties moved for a directed verdict on his counterclaims and the court granted this motion resolving all claims in the case.

{¶ 11} On September 5, 2025, the West 6th Parties appealed, raising the following assignment of error:

> The trial court committed reversible error in granting [Culkar's] motion for directed verdict.

{¶ 12} On September 10, 2025, Culkar cross-appealed raising the following assignments of error:

> I. The trial court erred in granting directed verdict in favor of [West 6th Parties] with respect to defendant Culkar's counterclaim of unjust enrichment.

> II. The trial court erred in granting directed verdict in favor of [West 6th Parties] with respect to defendant Culkar's counterclaim of conversion.

**Testimony Presented at Trial**

{¶ 13} The following testimony and evidence were presented at trial.

**Frank Winters**

{¶ 14} Winters, who is not a party in this case, testified that he, Culkar, Mann, Koz and Hanna were the owners of the company. Each partner owned 20 percent of the business. Winters, Koz and Mann were the "finance guys" while Culkar and Hanna ran the nightclub. Winters testified as follows regarding purchasing the building for the business' operation:

> I was approached by Joe and Tom to open the [company] and it was a business venture after Panini's and after we did that we had an opportunity to buy the building. I put the money up front for the building to purchase the building and gave each partner 20 percent of the building with no money involvement and I pretty much financed it. And me, [Koz] and [] Mann were the finance guys of the nightclub and [Culkar] and [Hanna] pretty much ran it from the perspective of them knowing the bar business.

Winters testified that Culkar was the operating manager of the company, running the business and that Hanna was second in command.

{¶ 15} Winters was involved in several other business ventures with Culkar including: Panini's downtown, Panini's Westlake, Barcelona in Westlake and American Recovery Solutions (a debt collection company).

{¶ 16} From 1997 to 2013 Winters never had any hands-on involvement in the operations of the business. In 2013, Mann called a partner meeting where all five partners met at Panini's in Westlake. Mann presented Culkar with information regarding the company's financials after Mann had reviewed the QuickBooks, their accounting software as well as the company's bank account and points of sale system reports from the registers. Mann brought two main things to the other partners'

attention after looking at the finances. First, there was $31,000 in cash that was "made at the bar" on New Year's Eve 2011/2012 that "never went into the bank" and second, there was $56,000 in cash from St. Patrick's Day that never made it to the company's bank account, either. When Culkar was asked about it, he said "that was his pay." There was also discussion about the fact that Culkar was using the company's bank account as his personal bank account and that he withdrew money from the account as loans to other businesses.

{¶ 17} Winters testified that when approached about the problematic financial dealings at this meeting in Panini's, Culkar "kind of admitted that, yes, he was doing that, and that he would pay us back." Also, at that meeting the partners agreed Culkar was "out" and that Hanna would become the operating partner of the business. Culkar was allowed to go into the business and look at the books and records, but he was not to run the business.

{¶ 18} Winters testified as to a Standstill Agreement, which he said was drafted by Culkar's attorney. Langshaw was hired to do an accounting of the company's finances pursuant to the Standstill Agreement and, by signing the agreement, the parties agreed to be bound by Langshaw's conclusions. Winters met Langshaw through Culkar as Langshaw prepared Culkar's taxes. Winters understood the Standstill Agreement to provide that the partners would not take legal action against Culkar and vice versa and that Culkar would not "move" real properties that he owned at the time.

{¶ 19} Langshaw was paid by the company. Winters received Langshaw's report when it was finished. Winters believed Langshaw's report concluded that $2.3 million is owed.

{¶ 20} Under cross-examination Winters admitted that the report "doesn't say it's owed." It was Winters' understanding that Langshaw would be looking at the company's finances as provided by both the company and Culkar although no information was provided by Culkar.

{¶ 21} Winters believed Culkar was "kicked out" of the company after he admitted to stealing $200,000 from it in 2013 after the Standstill Agreement was signed.

{¶ 22} Winters testified that he was involved in a prior lawsuit with Culkar regarding another business that was settled. Pursuant to that settlement, Winters agreed not to sue Culkar again which is why Winters was not a plaintiff in this case.

{¶ 23} Winters was aware that at some point, Culkar's ownership in the company was taken as Winters' (and the other three partners') ownership interest increased from 20 percent to 25 percent. This was done without a conversation with Culkar or with Winters having any conversation with the other partners. Winters never asked from where the extra five percent ownership interest came. To Winters' knowledge there was never a vote between the other four partners to remove Culkar from the business and redistribute his 20 percent amongst the other four shareholders. The extra five percent ownership interest merely appeared on

Winters' K-1.[2]  A composite exhibit of the company's tax returns reflects that as of Winters' 2017 K-1, his shareholder percentage was 25 percent.

{¶ 24} Winters was aware that Culkar received an annual salary as well as both car and cell phone expenses that were compensation for running the company.

{¶ 25} To Winters' knowledge, after the Standstill Agreement was entered into, Culkar never requested access to the company's financial records.

{¶ 26} Winters did not go through Langshaw's report himself nor determine independently whether any of the expenses were legitimate, or illegitimate, business expenses.

### Douglas Langshaw

{¶ 27} Langshaw is an accounting and tax professional.  He runs a sole practitioner accounting firm that prepares small to medium size businesses' tax returns and occasional financial evaluations.  Langshaw has evaluated over 35 businesses throughout his career.  He is not a certified public accountant.  Langshaw met Culkar through a friend and client and eventually began preparing Culkar's personal tax returns and then several of Culkar's various businesses.  Langshaw prepared Hanna's personal taxes as well.  Culkar approached Langshaw to see if he would review the company's finances for the shareholders.

---

[2] While never explained by this witness or the parties, the court takes judicial notice that K-1 tax forms are used by pass-through entities to report a shareholder's share of income (distributions), losses, deductions and credits.  K-1s also show a shareholder's ownership percentage.

{¶ 28} Pursuant to the Standstill Agreement, Langshaw reviewed the company's financial books and records from the period of January 1, 2006 to December 31, 2012. According to Langshaw, he reviewed the company's ledgers, bank statements and checks written out of the bank account as well as its QuickBooks, point of sales reports from the registers, the handwritten daily cash logs and ATM logs.

{¶ 29} After reviewing these financial documents, Langshaw generated his report dated January 27, 2015. The report consisted of a 12-page narrative summary of what he did, how he obtained information, to whom he spoke and the limitations he incurred, that spelled out the entities and the percentages each individual owned, as well as the assumptions, utilizations and procedures he used to perform this task. He then created various spreadsheet summaries of the financial documents he reviewed, which he included in the report, along with many copies of endorsed checks.

{¶ 30} The summary which Langshaw created was titled "Summary of Questionable Transactions" in which he listed amounts of money that he flagged as questionable and which he related to Culkar. The types of funds missing included actual missing cash deposits (money brought in through cash registers but not deposited into the company bank account), estimated missing cash deposits (based on incomplete records and averaged deposits from available records), distribution payment discrepancies, automobile/cell phone expense discrepancies and "payroll and related expenses" paid to Culkar's wife. He also summarized penalties the

company incurred, and paid, for unpaid sales taxes, which Culkar was responsible for paying and bank service charge fees incurred for insufficient funds. In total, Langshaw documented $2,304,337 in "questionable and unexplained transactions, missing cash deposits, related penalties/fines, bank charges and estimated interest" relating to Culkar.

{¶ 31} Langshaw testified that his report was preliminary because he wanted to give Culkar the opportunity to respond and explain the questionable transactions. However, Culkar never responded nor did he provide Langshaw with sufficient documentation to explain the transactions. Langshaw testified that the only change he would make to his report would be that there is approximately $800,000 in accrued interest from December 31, 2012 to the day of trial. In preparing this report, Langshaw believed he was doing what was asked of him pursuant to the Standstill Agreement. He believes his estimates are very conservative.

{¶ 32} When asked under cross-examination if putting a check or amount under the "questionable payment" section of one of his summaries, of it was "your intent to say that this money was not used for the business" Langshaw's response was, "I don't know yet." When pressed, "you don't know one way or the other," Langshaw responded, "I don't have any proof." When asked if it was his intention when he put the questionable payments together that each of the payments referenced was not a legitimate expense of the business, Langshaw responded, "No."

{¶ 33} For example, Langshaw testified regarding a check to 320, Inc. for "license renewals" in the amount of $12,500, for which he would have liked to have

seen an invoice, an agreement or something from the outside corroborating this payment. He was never given any such document which is why it was listed as a "questionable payment." Langshaw admitted that the fact that there is no proof does not mean the money was not used for the business, because he does not know one way or another.

{¶ 34} Langshaw agreed that the fact that there was not some sort of back-up documentation with respect to questionable items does not mean they are not legitimate business expenses. Rather, it meant that Langshaw could not determine whether it was a legitimate expense. Regarding the aforementioned licensing renewal payment, Langshaw was looking for any agreement with 320, Inc., to know exactly for what this payment was made and if the amount was correct.

{¶ 35} When asked about a $3,000 check to 14810 Dining Group Inc., for a sound system, Langshaw said this payment was questionable, despite having a copy of the check, because he could not determine if the sound system was for the company or for 14810 Dining Group Inc. Langshaw did not have sufficient information to ascertain if it was a legitimate business expense.

{¶ 36} When asked if there were any payments he was certain were not legitimate expenses, Langshaw pointed to checks made out to "cash," but in the memo said "Frank," (partner Winters) and were listed in QuickBooks as distributions to Winters. Winters told Langshaw he never received checks like this for distributions. The checks were signed and endorsed by Culkar. Langshaw testified that these were not legitimate business expenses. However, when asked by

opposing counsel about whether Langshaw could say if this was a legitimate business expense or if he did not have enough information to make that determination, Langshaw responded, "yes," (that he does not have enough information). When asked if another check to Winters for a distribution that was signed and endorsed by Culkar was a legitimate business expense, Langshaw responded, "I'm not sure."

{¶ 37} When asked again to point out any payments he was certain were not legitimate business expenses, Langshaw identified another check, but when asked by counsel "was that a legitimate business expense or do you not know," Langshaw responded, "Not sure. But again, distributions are not expenses either." Culkar's counsel followed with:

Q. It was a legitimate distribution?

A. Yes.

Q. Do you know?

A. I don't know.

{¶ 38} Culkar's counsel again asked Langshaw to identify a transaction he knew was not a legitimate business expense. Langshaw pointed out a check that listed Ohio Treasurer of State in the memo. He stated this was for a liquor sales tax payment of $12,963.90. He noted that only $7,123.82 was actually paid to the State for sales tax. Langshaw wanted Culkar to explain the difference. When asked if he knew whether it was, or was not, a legitimate business expense, Langshaw responded, "A portion of it, definitely I know." When asked to explain what he knew,

Langshaw stated that he knew the reimbursement was over the amount of what was paid in sales tax but stated that "I need proof is what I need."

{¶ 39} Asked again to state which payments he knew were not legitimate business expenses, Langshaw pointed to a check made payable to Michelle Royer ("Royer") for $1,000. The description of the service is "painting." The check was signed and endorsed by Culkar. Langshaw discussed this with the other partners who said they never saw Royer painting in the company and that Royer was Culkar's "baby mama." Langshaw never saw an invoice for the $1,000. However, Langshaw clarified that if Royer did paint for the company, this would be a legitimate business expense.

{¶ 40} When again asked to go through and note which expenses were specifically not legitimate, Langshaw responded, "I got to say probably 90 to 95 percent." This was in reference to the items listed in "questionable payment." Langshaw believed that checks that were unsubstantiated were not legitimate expenses of the company. He could not determine if they were legitimate business expenses without additional proof. Langshaw stated that there should be other documents to legitimize the payments such as an invoice or an agreement.

{¶ 41} Again, when asked if you used the word "'questionable payments' you don't know because you didn't get enough information in your mind to determine whether they are legitimate or not legitimate," Langshaw responded, "Correct." When asked, "You haven't come to a conclusion with respect to these items in the

questionable payments, that you would need other information in order to do that," Langshaw responded, "Correct."

{¶ 42} Langshaw did not review the partners' tax returns to verify if, as they said, that they did not take any cash payments from the company, was true.

{¶ 43} Langshaw admitted that the discrepancy of missing cash deposits could be explained by the shareholders taking cash distributions but the four other partners told him they had not received cash payments for the time period covered in the report.

### Thomas Culkar on Cross-Examination

{¶ 44} Culkar testified as if on cross-examination that he had legal representation when he signed the Standstill Agreement, that he was not coerced and that he read it before signing it. He understood the terms of the agreement. Langshaw had prepared Culkar's taxes for five to six years before performing the work pursuant to the Standstill Agreement.

{¶ 45} Culkar thought the Standstill Agreement was breached because it was supposed to allow everyone to meet and discuss the issues amongst themselves, but Hanna was so angry that the partners were never able to do just that. Culkar testified that Hanna had a personal vendetta against him due to a falling out with the Panini's business. Culkar does not believe he breached the Standstill Agreement.

{¶ 46} Culkar believed he provided Langshaw with sufficient information to explain a number of the questionable transactions and Langshaw chose not to include those in his report.

**{¶ 47}** Culkar testified that he distributed cash to the partners, as shareholder distributions, between 1997 and 2013 which would account for the missing cash. This also included the "questionable payment" and the missing cash deposits. If the cash did not go to entertainment, security/police or the bank, then it was split between the partners. Culkar testified that he never took funds from the company for personal use.

**{¶ 48}** Culkar testified that, after the Standstill Agreement was signed, he was locked out of the company, its computer, records in the basement, accounts and the departments to whom he wrote checks.

**{¶ 49}** Culkar testified that he and Hanna owned 14810 Dining Group Inc., and the company bought 14810 Dining Group Inc.'s sound system when 14810 Dining Group Inc. went out of business. The same occurred with the purchase from 3634 Group, Inc., which was another club owned by Culkar and Hanna. Company funds were used to purchase 3634 Group, Inc.'s lighting and sound systems. Culkar was unaware if any of the partners, other than Hanna, were aware of the purchase.

**{¶ 50}** Culkar paid himself an annual salary of "around $90,000." This was not discussed at a meeting with the partners but Hanna knew about it. Culkar testified that his wife worked at parties for the company. He also testified that during 2012, he was working at a business in Florida so she, then, was performing "a lot of . . . some of" his duties at the company for him. Her salary came from him cutting his salary in half, ergo, the company did not incur any additional cost.

**Culkar's Directed Verdict Motion**

{¶ 51} West 6th Parties rested and Culkar moved for a directed verdict. Culkar alleged West 6th Parties failed to provide any evidence as to damages that were not speculative. Culkar argued that failing to prove damages was fatal to each of West 6th Parties' claims.

{¶ 52} The trial court pressed West 6th Parties' counsel about "what evidence of mistake, misappropriation, fraud, or theft have you presented," regarding the terms of the Standstill Agreement. The West 6th Parties pointed out the court was leaving out key language from the agreement, but the court stated that, by relying on this language, the West 6th Parties were basing their contract claim on "some nonsensical verbiage." The court found the following regarding the West 6th Parties' claims:

> The only evidence of damages is the report of Mr. Langshaw. Unfortunately, Mr. Langshaw's report only refers to questionable transactions. The law is a tough master. It requires precision. And Mr. Langshaw's report does not provide the precision required to get this matter to a jury. Questionable transactions is a verbiage that's not the same as mistake, misappropriation, fraud, or theft. So therefore, having not presented any evidence of damages the court is going to grant the defendant's motion for [directed verdict] on all of the [West 6th Parties'] claims.

**Culkar Direct Examination**

{¶ 53} Culkar presented his case-in-chief regarding his counterclaims for conversion and unjust enrichment. Culkar testified he was a shareholder of West 6th Partners, Inc. owning 20 percent with four partners. Culkar acted as the general manager, overseeing the business's operation. He was involuntarily removed as a

shareholder in 2017, that is when he stopped receiving K-1s. The other partners removed him from the company. He only learned he was no longer a shareholder in 2022 when the West 6th Parties filed the complaint in this action. He believed he was a shareholder up until that point.

{¶ 54} The last time Culkar received a shareholder distribution was in 2012. After 2012 he received K-1s but never distribution checks. Culkar tried to "get [his] distributions through Joe Mann." The reason he was told he was not getting his distributions was because, "[t]hey told me I stole from them." They never told him he was no longer a shareholder. Evidence in the record reflects Culkar's ownership percentage as 20 percent in 2016 and his distribution as $8,169, which he did not receive. Culkar's 2017 K-1 does not show an ownership percentage. It took him a while to receive the 2017 K-1; he did not see it in 2018 when he should have. The remaining shareholders assumed his ownership percentage. Culkar did not abandon his shares nor did he consent to transferring them.

{¶ 55} Culkar admitted that at least as of 2013 he knew he was not receiving distributions from the company.

{¶ 56} Culkar rested and the West 6th Parties made a motion for directed verdict regarding Culkar's counterclaims for unjust enrichment and conversion. West 6th Parties argued that the statute of limitations for conversion is four years and because the counterclaim was filed in 2022, the furthest back for which the jury could consider damages is 2018. The West 6th Parties also argued that Culkar had

knowledge in 2012 that the company took adverse action against him when he stopped receiving distributions and the conversion claim should be dismissed.

{¶ 57} The trial court found that Culkar's knowledge or right to sue originated from the end of the Standstill Agreement issued on January 27, 2015, when Langshaw released his report, which effectively self-terminated the Standstill Agreement. The court found the statute of limitations had run for both Culkar's unjust-enrichment and conversion claims and granted West 6th Parties' motion for a directed verdict regarding Culkar's counterclaims.

**Law and Argument**

**Directed Verdict Standard of Review**

{¶ 58} Both parties appeal the trial court's granting of directed verdict motions.

{¶ 59} As this court has previously stated:

> We review the grant or denial of a motion for directed verdict pursuant to a de novo standard of review. *Loreta v. Allstate Ins. Co.*, 8th Dist. Cuyahoga No. 97921, 2012-Ohio-3375, ¶ 5, citing *Grau v. Kleinschmidt*, 31 Ohio St.3d 84, 90, 509 N.E.2d 399 (1987). We construe the evidence presented most strongly in favor of the nonmoving party and determine whether reasonable minds could only reach a conclusion that is against the nonmoving party. *Sivit v. Vill. Green of Beachwood*, 8th Dist. Cuyahoga No. 98401, 2013-Ohio-103, ¶ 11, citing *Titanium Industries v. S.E.A. Inc.*, 118 Ohio App.3d 39, 691 N.E.2d 1087 (7th Dist. 1997), citing *Byrley v. Nationwide Ins. Co.*, 94 Ohio App.3d 1, 640 N.E.2d 187 (6th Dist. 1993). In considering whether a trial court properly granted a motion for directed verdict, we do not weigh the evidence or test the credibility of the witnesses. *Sivit* at ¶ 12. We assume the truth of the evidence supporting the facts essential to the claim of the party against whom the motion is directed and give that party the benefit of all reasonable inferences from that evidence. *Id.*, citing *Becker v. Lake Cty. Mem. Hosp. W.*, 53 Ohio St.3d

202, 206, 560 N.E.2d 165 (1990), citing *Ruta v. Breckenridge-Remy Co.*, 69 Ohio St.2d 66, 68, 430 N.E.2d 935 (1982).

*Rebello v. Lender Processing, Servs.*, 2015-Ohio-1380, ¶ 26 (8th Dist.), (*accord* Civ.R. 50(A)(4)). "Civ.R. 50(A) motions for directed verdict do not present factual issues, but instead present questions of law." *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 25. "[T]he court must determine whether any evidence exists on every element of each claim or defense for which the party has the burden to go forward." *Id.*

### West 6th Parties' Assignment of Error

{¶ 60} The West 6th Parties allege the trial court erred in granting Culkar's motion for a directed verdict on their claims for breach of contract, breach of fiduciary duty/misappropriation of funds, unjust enrichment and money had and received. Because our review is de novo, we review each claim to determine if the presented evidence, construed most strongly in the favor of the nonmoving party, is sufficient to support every element of each claim such that reasonable minds could only reach one conclusion.

### Breach of Contract

{¶ 61} The West 6th Parties brought a breach-of-contract claim against Culkar alleging that he violated the Standstill Agreement by not repaying $2,304,337 to any of the company's shareholders or West 6th itself.

{¶ 62} "To prevail on a claim for breach of contract, a plaintiff must prove: (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant and (4) damages resulting from the breach." *Yeckley Ents., Inc. v.*

*Huntington Natl. Bank*, 2024-Ohio-5812, ¶ 34 (8th Dist.). "The failure to establish any one of these essential elements is fatal to the cause of action." *Wells v. Right Choice Contracting, LLC,* 2026-Ohio-117, ¶ 15 (8th Dist.).

{¶ 63} Culkar admits in his brief that the Standstill Agreement is a binding enforceable contract and, therefore, the existence of the contract is not in dispute, establishing the first element.

{¶ 64} Reviewing the evidence presented at trial, Langshaw testified that he spoke with all the partners and reviewed voluminous financial records of the company. At no point did he testify that any of the West 6th Parties failed to cooperate with his investigation. There is also no evidence that any of the West 6th Parties violated any of the forbearances or any other term of the Standstill Agreement. Construing this evidence in the light most favorable to the West 6th Parties we find that reasonable minds could conclude that the West 6th Parties performed under the contract, establishing the second element.

{¶ 65} The question at issue is, was there sufficient evidence presented at trial to support the third element of a breach of contract claim i.e., that Culkar breached the Standstill Agreement?

{¶ 66} To establish Culkar's duties under the Standstill Agreement, the West 6th Parties point to the recitals section of the contract which was incorporated into the document and states in relevant part that:

> Whereas, the Parties have agreed to defer to the business judgment valuation, metrics, distribution analysis, and reconciliation of debts and liabilities of [West 6th St. Partners, Inc.] . . . and the individual

Parties to be prepared by Douglas Langshaw, CPA, in arriving at a fair and equitable division of their business interests. All of the parties agree to be bound by the opinions arrived at by Mr. Langshaw in his investigation and audit of any and all records, tax returns, books, documents of any kind which bear any relevance what-so-ever to the issues aforementioned. *By signing this agreement the parties agree to be bound by the amounts and determinations made with respect to any and all payments due or monies owed to the respective companies and/or individuals who are named in this agreement. Mr. Langshaw's conclusions will have the effect of a judgment against whomever it is determine may owe bills, debts or monies owed as a result of mistake, misappropriation, fraud, theft or by any other means.*

(Emphasis added.)

West 6th Parties further points to the subsection titled "Binding Nature":

This agreement and the ultimate findings of Mr. Langshaw will act as a judgment agreed upon by the parties which will not be appealable. All parties have agreed to pay and/or accept monies, values, distributions as if Mr. Langshaw's findings were final appealable orders by a common pleas or federal court.

{¶ 67} We note that in the Standstill Agreement, the parties agreed to a "Standstill Period" that would exist from the date the Standstill Agreement was signed until the completion of Langshaw's report. During the Standstill Period, the Parties agreed to forebear certain acts including but not limited to instituting "mediation, arbitration, or litigation" against the parties, to refrain from slanderous behavior, to not hide assets that may be used to satisfy settlement, to not make distributions to owners, to pay bills, etc. The parties also agreed that, to the extent requested by Langshaw, they would provide any information, documents or data, answer questions or otherwise assist and participate in his investigation. The parties also agreed to toll the statute of limitations during the Standstill Period.

**{¶ 68}** Under the clear and unambiguous terms of the Standstill Agreement the parties agreed to a business valuation to be performed by Langshaw and agreed to be bound by his conclusions and determinations as to whomever he found owed "bills, debts or monies owed as a result of mistake, misappropriation, fraud, theft or by any other means." The parties agreed they would not dispute these determinations.

**{¶ 69}** A review of the record, including Langshaw's report and testimony, however, reveals a lack of evidence to support the claim that Culkar breached the Standstill Agreement, failing to establish the third element of breach of contract.

**{¶ 70}** Langshaw's report contains a 12-page summary that includes the purpose/scope of the report, limitations incurred in the review and assumptions utilized/procedure performed. Nowhere in this summary does Langshaw make any conclusions or determinations about who owes money or that Culkar specifically owes money to either the company or the other shareholders for "bills, debts or monies owed as a result of mistake, misappropriation, fraud, theft or by any other means."

**{¶ 71}** Similarly, Langshaw's testimony also failed to state that any specific funds or payments received by Culkar were improper or not legitimate business expenses. Langshaw testified repeatedly that while there were lots of "questionable transactions," they were questionable because he needed more information to properly evaluate whether they were for legitimate business expenses. At no point during his testimony did Langshaw conclude or determine that Culkar "owe[d] bills,

debts or monies [] as a result of mistake, misappropriation, fraud, theft or by any other means."

{¶ 72} Simply put, the West 6th Parties failed to present evidence that Culkar owed money to the company or the other partners. There is not sufficient evidence to establish that Culkar breached the Standstill Agreement.

{¶ 73} Because there was no evidence to support the third element of a breach-of-contract claim, we find the trial court correctly granted a directed verdict regarding this claim as reasonable minds could only come to one conclusion.

## Breach of Fiduciary Duty/Misappropriation of Funds

{¶ 74} In the West 6th Parties' appellate brief their claims for breach of fiduciary duty and misappropriation of funds are discussed as one claim, with only the elements of breach of fiduciary duty being presented. The West 6th Parties state that a claim for misappropriation of funds constitutes a breach of fiduciary duty. In their complaint, while misappropriation of funds is a separate claim, it does not have any elements listed and we find no case in Ohio which list elements to support such a claim by itself. As such, they will be discussed together.

{¶ 75} The second claim for which the trial court granted a directed verdict was West 6th Parties' claim that Culkar breached his fiduciary duty to West 6th. In their amended complaint, West 6th Parties alleged that Culkar had fiduciary duties of honesty, loyalty, good faith and fair dealings to West 6th and other shareholders. They alleged he breached his duties to exercise sound business judgment, refrain from engaging in any conduct that would be harmful to the company or other

shareholders, and to conscientiously perform his oversight and other responsibilities as manager of the company properly. They allege Culkar disregarded the best interest of the company and its shareholders, mismanaged the business, harmed the company's business reputation, wrongfully withdrew and misappropriated company funds and/or assets and failed to pay taxes and comply with other laws.

{¶ 76} "The elements of a breach of fiduciary duty are: '(1) the existence of a fiduciary duty; (2) the failure to observe the duty; and (3) an injury resulting proximately therefrom.'" *Breen v. Group Mgt. Servs.*, 2022-Ohio-2689, ¶ 17 (8th Dist.), quoting *DPLJR, Ltd. v. Hanna*, 2008-Ohio-5872, ¶ 19 (8th Dist.), citing *Strock v. Pressnell*, 38 Ohio St.3d 207 (1988).

{¶ 77} "Generally, a close corporation is a corporation with a few shareholders and whose corporate shares are not generally traded on a securities market." *Tinter v. Lucik*, 2007-Ohio-4437, ¶ 23 (8th Dist.), citing *Crosby v. Beam*, 47 Ohio St.3d 105, 107 (1989). "The ownership of a close corporation is limited to a small number of people who are dependent on each other for the enterprise to succeed." *Id.* It is well established that a fiduciary duty exists between shareholders of a close corporation. *Id.* Generally, claims for breach of fiduciary duties are brought in derivative suits, but one exception to this rule is where the case involves claims by shareholders in a close corporation. *Hanko v. Nestor*, 2019-Ohio-2256, ¶ 19 (6th Dist.).

{¶ 78} This fiduciary duty of shareholders in a close corporation "imposes on the members of the firm the obligation of the utmost good faith in their dealings with one another with respect to partnership affairs, of acting for the common benefit of all the partners in all transactions relating to the firm business, and of refraining from taking any advantage of one another by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind." *Lorain Natl. Bank v. Saratoga Apts.*, 61 Ohio App.3d 127, 130 (9th Dist. 1989); *see also Hanko* at ¶ 51 ("It is well-settled that shareholders in a closely held corporation 'owe one another a fiduciary duty to act in good faith and refrain from self-dealing.'") quoting *Beam* at 107-108; *accord Morgan v. Ramby*, 2012-Ohio-763, ¶ 23 (12th Dist.); *Heaton v. Rohl*, 2011-Ohio-2090, ¶ 54 (11th Dist.); *Hickerson v. Hickerson*, 2010-Ohio-4070, ¶ 25 (3d Dist.); *Ramun v. Ramun*, 2009-Ohio-6405, ¶ 43 (7th Dist.).

{¶ 79} Testimony was presented that West 6th was a close corporation with only five shareholders. There was no evidence that it was traded on the securities market. The testimony established that the shareholders were dependent on each other for the enterprise to succeed as Winters, Koz and Mann were the "finance guys" who depended on Culkar and Hanna, with their knowledge of operating a bar, to run the business. As such, we find West 6th was a close corporation and Culkar owed West 6th and the other shareholders a fiduciary duty to act in good faith and refrain from self-dealing, establishing the first element of this claim.

{¶ 80} At trial, evidence was presented by Winters that he and the other shareholders did not receive any cash distributions after 2003. Langshaw presented evidence that there were actual missing cash deposits totaling $833,528 and an additional $524,777 in estimated missing cash deposits. He also testified that there were dozens of questionable payments made payable to "cash" or to Culkar himself and/or entities he owned. Langshaw testified that there were checks made payable to partners, like Winters, for distributions that Winters never received and that these checks were cashed by Culkar. Langshaw also testified that there were bank service charges totaling $78,308 and sales taxes that were not paid.

{¶ 81} Conversely, Culkar testified that any cash that was not deposited was distributed to the partners and that is where the missing cash went. However, assuming the truth of Winters' testimony, Langshaw's testimony and Langshaw's report, there is sufficient evidence to support a claim that Culkar breached his fiduciary duty to act in good faith and refrain from self-dealing thereby causing damage to the other shareholders.

{¶ 82} Construing the evidence in light most favorable to the West 6th Parties, we find that there was sufficient evidence to support a claim for breach of fiduciary duties but that reasonable minds could disagree about whether Culkar breached his fiduciary duties such that a directed verdict on this claim was improperly granted.

**Unjust Enrichment**

{¶ 83} The next claim for which the trial court granted a directed verdict was West 6th Parties' claim for unjust enrichment. To support this claim, the West 6th Parties allege in their amended complaint that the initial capital investment needed to open the company was provided by Mann, Koz and Winters and that this investment was the benefit conferred onto Culkar. They allege "Culkar repaid" them for this by unlawfully absconding with more than $2,000,000 of the company's money and that, under these circumstances, it is unjust for Culkar to retain the original financial benefit.

{¶ 84} Unjust enrichment occurs where "a person 'has and retains money or benefits which in justice and in equity belong to another.'" *Johnson v. Microsoft Corp.*, 2005-Ohio-4985, ¶ 20, quoting *Hummel v. Hummel*, 133 Ohio St. 520, 528 (1938). "The purpose of an unjust enrichment claim is . . . to enable the plaintiff to recover the benefit he has conferred on the defendant under circumstances in which it would be unjust to allow the defendant to retain it." *San Allen v. Buehrer*, 2014-Ohio-2071, ¶ 114 (8th Dist.), citing *Johnson* at ¶ 21.

{¶ 85} "The elements of an unjust enrichment claim are: (1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment." *Poston ex rel. Poston v. Shelby-Love*, 2017-Ohio-6980, ¶ 20 (8th Dist.).

{¶ 86} Reviewing the evidence at trial we find there was no evidence presented to support this claim that the plaintiffs, i.e., West 6th, Alexsandrea Mann or Koz conferred a specific benefit to Culkar. There was testimony from Winters that he financed the purchase of the building from which the company operated and that he gave each partner 20 percent of the building. He also stated that "[a]nd me, [Koz] and [] Mann were the finance guys of the nightclub and that [Culkar] and [Hanna] pretty much ran it from the perspective of them knowing the bar business." This was the only evidence presented of any alleged specific benefit conferred to Culkar from the West 6th Parties. Considering this specific alleged benefit of the building was conferred by Winters, who is not a party to this lawsuit, and merely the statements that Mann and Koz were "finance guys," there is not sufficient evidence to establish that the West 6th Parties conferred a specific benefit upon Culkar as alleged in the amended complaint.

{¶ 87} The West 6th Parties cite no case law or evidence in the record to support their argument that the trial court improperly granted the motion for directed verdict on this claim.

{¶ 88} Even construing this minimal evidence in light most favorable to the West 6th Parties, we find that reasonable minds can only come to one conclusion: there was no actual evidence of any benefit being conferred upon Culkar by way of an initial investment by the West 6th Parties. As such, the trial court properly granted a directed verdict on this claim for unjust enrichment.

**Money Had and Received**

{¶ 89} Lastly, the West 6th Parties alleged a claim for money had and received, on which the trial court granted a directed verdict for Culkar. The West 6th Parties alleged in their complaint that Culkar wrongfully withheld and failed to repay the money outlined in Langshaw's report, which Culkar agreed to pay in writing pursuant to the Standstill Agreement and that it would be unjust for Culkar to retain such money.

{¶ 90} An action for "money had and received" is a claim in quasi-contract which, in turn, is based upon the equitable doctrine of unjust enrichment. *Drozeck v. Lawyer Title Ins. Corp.*, 140 Ohio App.3d 816, 823 (8th Dist. 2000), citing *Hummel,* 133 Ohio St. 520, at 526-527. "It is well settled that a party may not recover in quasi-contract in the face of an express contract governing the same subject matter." *U.S.A. Parking Sys. v. Pitney Bowes Global Fin. Servs.*, 2010 U.S. Dist. LEXIS 21869, *10 (N.D. Ohio Mar. 8, 2010) (finding plaintiff could not succeed on an action for money had and received because there was an express contract governing the same subject matter) citing *Ullmann v. May*, 147 Ohio St. 468 (1947). *See Donald Harris Law Firm v. Dwight-Killian*, 2006-Ohio-2347, ¶ 15 (6th Dist.) ("Consequently, because an express contract existed between the Parties, appellant could not rely upon any theory of quasi-contract for recovery."); *Lehmkuhl v. ECR Corp.*, 2008-Ohio-6295, ¶ 55 (5th Dist.) ("Ohio law is clear that a plaintiff may not recover under the theory of unjust enrichment or quasi-contract when an express

contract covers the same subject.") citing *Ullmann* at paragraph four of the syllabus and *Cincinnati v. Cincinnati Reds,* 19 Ohio App.3d 227 (1st Dist. 1984).

{¶ 91} Here, the West 6th Parties' claim for money had and received is based squarely on Culkar's alleged failure to repay funds pursuant to Langshaw's report in breach of the Standstill Agreement. The money allegedly had and received by Culkar are the same monies alleged in Langshaw's report and are the basis of West 6th Parties' arguments in their breach-of-contract claim. We find there is an express contract here covering the same subject matter as the quasi-contract claim and it covers the exact same monies that are being alleged to have been had and received by Culkar.

{¶ 92} As such, as a matter of law, the West 6th Parties cannot succeed on their claim for money had and received because it is based on the breach of an express contract that is governing the same subject matter. Wherefore, the trial court properly granted a directed verdict regarding this claim.

{¶ 93} Based on the foregoing, West 6th Parties' assignment of error is overruled, in part, and sustained, in part. The trial court properly granted a directed verdict regarding their breach-of-contract, unjust-enrichment and money had received claims but erred by granting a directed verdict as to their claim for breach of fiduciary duty/misappropriation of funds. Therefore, the matter is remanded to be retried on this claim.

{¶ 94} We now consider Culkar's cross-assignments of error.

## Culkar's First Cross-Assignment of Error — Unjust Enrichment

{¶ 95} Culkar alleges the trial court improperly granted the West 6th Parties' motion for directed verdict as to his counterclaim for unjust enrichment. Culkar alleges in his counterclaim that the West 6th Parties "unlawfully exerted control over" Culkar's shares in West 6th to Culkar's detriment "conferring a substantial benefit" to the West 6th Parties.

{¶ 96} The elements of an unjust-enrichment claim are stated above. Additionally, we note, "[a] claim for unjust enrichment is an equitable claim based on a quasi-contract." *Widok v. Wolf*, 2020-Ohio-5178, ¶ 74 (8th Dist.), citing *Padula v. Wagner*, 2015-Ohio-2374, ¶ 47 (9th Dist.); *see also Hummel*, 133 Ohio St. 520, at 525-528. "A claim for unjust enrichment arises when one person has unfairly benefitted from the services of another. In that event, courts have adopted a legal fiction, quasi-contract, to provide a remedy allowing the aggrieved party to seek recovery for as much as he deserves." *Novomont Corp. v. The Lincoln Electric Co.*, 2001 Ohio App. LEXIS 4885 (8th Dist. Nov. 1, 2001), quoting *Caras v. Green & Green,* 1996 Ohio App. LEXIS 3162 (2d Dist. June 28, 1996).

{¶ 97} Upon review of the evidence, we find that Culkar is unable to succeed on his counterclaim for unjust enrichment. These claims are generally reserved for situations when one person has unfairly benefited from the services of another. There is no evidence in the record that Culkar provided any services to the West 6th Parties from which they have unfairly benefitted. If anything, there was testimony

that when the West 6th Parties exerted control over his shares and, after 2013, he no longer worked at the company and never again stepped foot in the business. Culkar was, therefore, not providing any services to the West 6th Parties from which they could have unfairly benefited during the alleged timeframe.

{¶ 98} Specifically, there is no evidence in the record that Culkar conferred any alleged benefit to the West 6th Parties, failing the first element of an unjust-enrichment claim. Even in the pleading of this counterclaim Culkar's allegation that the West 6th Parties "unlawfully exerted control over" his shares confirms that he did not confer this alleged benefit of his shares to the West 6th Parties.

{¶ 99} Culkar provides no case law to support his argument that unjust enrichment applies in this case and to facts such as these, where a shareholder's shares in a company are taken by the other shareholders. Culkar instead merely points to the evidence that establishes that his 20 percent ownership interest was taken by the other partners and redistributed amongst themselves and that this was done unilaterally and without his consent. Unjust enrichment is not the proper vehicle to recover his shares in this instance.

{¶ 100} As such, construing the evidence most favorably to Culkar, reasonable minds can only come to one conclusion: Culkar is unable to succeed on a claim for unjust enrichment. We find the trial court properly granted a directed verdict against Culkar regarding this counterclaim.

{¶ 101} Culkar's first cross-assignment of error is overruled.

**Culkar's Second Cross-Assignment of Error — Conversion**

{¶ 102} In his second cross-assignment of error Culkar alleges that the trial court erred by granting a directed verdict as to his counterclaim for conversion. Culkar alleged in his counterclaim that he was the lawful owner of his 20 percent interest in West 6th and that the West 6th Parties unlawfully exerted control over his shares to his detriment damaging him by the loss of their value and the loss of profits distributed to shareholders. Culkar alleges in his cross-appellate brief that it was the conversion of his interest and the distributions for each year that form the basis of his conversion counterclaim.

{¶ 103} As previously stated by this court:

> Conversion is "the wrongful control or exercise of dominion over the property belonging to another inconsistent with or in denial of the rights of the owner." *Beavers v. PNC Bank, N.A.*, 8th Dist. Cuyahoga No. 99773, 2013-Ohio-5318, ¶ 29. The elements of conversion are "'(1) plaintiff's ownership or right to possession of the property at the time of conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages.'" *Schiff v. Dickson*, 8th Dist. Cuyahoga Nos. 96539 and 96541, 2011-Ohio-6079, ¶ 30, quoting *Dream Makers v. Marshek*, 8th Dist. Cuyahoga No. 81249, 2002-Ohio-7069, ¶ 19.

*Poston ex rel. Poston v. Shelby-Love*, 2017-Ohio-6980, ¶ 18 (8th Dist.). "Money may be converted when it is identifiable and there is an obligation to return the specific money in question." *Tinter*, 2007-Ohio-4437, at ¶ 36, citing *Kiss v. Dick Baker Dodge*, 1998 Ohio App. LEXIS 6326 (6th Dist. Dec. 31, 1998).

{¶ 104} The West 6th Parties argue in their motion for directed verdict and appellate brief that Culkar's claim is barred wholly, or in part, by the applicable

statute of limitations. They allege that when Culkar stopped receiving distributions in 2013 he was aware of the conversion and his claim began to accrue then. They conversely argue that when he received his 2017 K-1, which showed his ownership interest at zero percent, he was put on notice of his claim such that when he filed his counterclaim in 2022 it was barred by the statute of limitations.

{¶ 105} Culkar argues the conversion claim is not barred by the statute of limitations because he was not made aware that his shares were converted until the amended complaint was filed alleging he was no longer a partner of West 6th. In the alternative, he argues that each distribution and the shares converted are separate claims and that some of his claims may be barred but not all of them.

{¶ 106} R.C. 2305.09 states that conversion claims "shall be brought within four years after the cause accrued." A cause of action "accrues" when the tortious acts are committed. *Mattress Matters, Inc. v. Trunzo,* 2016-Ohio-7723, ¶ 12 (8th Dist.), citing *Lynch v. Dial Fin. Co.,* 101 Ohio App.3d 742, 747 (8th Dist. 1995). "However, because a plaintiff may have no knowledge that a tort has been committed, the discovery rule tolls the statute of limitations until a plaintiff discovers or, in the exercise of reasonable diligence, should have discovered, the injury." *Id.,* citing *O'Stricker v. Jim Walter Corp.,* 4 Ohio St.3d 84 (1983), paragraph two of the syllabus; *Melnyk v. Cleveland Clinic,* 32 Ohio St.2d 198 (1972).

{¶ 107} As this court has explained

> Thus, the statute of limitations is tolled until a "cognizable event . . . leads or should lead the plaintiff to believe that he has been injured and thus places him on notice of the need to pursue his remedies." *Barley*

*v. Fitcheard*, 8th Dist. Cuyahoga No. 91458, 2008-Ohio-6159, ¶ 13, citing *Flowers v. Walker*, 63 Ohio St.3d 546, 549, 589 N.E.2d 1284 (1992); *Kiefer v. Mark Domo, D.D.S., Inc.*, 8th Dist. Cuyahoga No. 86262, 2006-Ohio-445. A plaintiff need not have discovered all the relevant facts necessary to file a claim in order to trigger the statute of limitations. Rather, the "cognizable event" puts the plaintiff on notice to investigate the facts and circumstances relevant to the claim in order to pursue available remedies. *Id.*

*Trunzo* at ¶ 15.

{¶ 108} We turn to the evidence presented at trial to support this claim. Culkar testified at trial that he owned a 20 percent interest in the company and that the last shareholder distribution he received was in 2012. After that time, he continued to receive K-1s for his taxes but he never received another distribution check. Culkar testified that he attempted to get his distribution through Mann. Culkar was told that he was not getting distributions because he "stole from them." He was never told that he was not a shareholder. Culkar's 2016 K-1 showed his ownership percentage of West 6th at 20 percent and a distribution of $8,169, which he did not receive. Culkar's 2017 K-1 showed no ownership interest and the other partners' 2017 K-1s show their ownership at 25 percent. Culkar testified that it took him a while to receive his 2017 K-1 and had to file his taxes late. He testified that he did not see his 2017 K-1 in 2018. He testified that he did not discover he was no longer a shareholder until 2022 when the West 6th Parties filed the complaint in which they alleged he was no longer a partner.

{¶ 109} Winters testified that he was aware at some point that Culkar's ownership interest was taken by the other partners and that Winters' interest went

from 20 percent to 25 percent. This was done without any conversation with Culkar or without any vote amongst the other shareholders to remove Culkar from the business.

{¶ 110} Importantly, there was no evidence presented by the West 6th Parties to dispute these facts nor did they present any evidence to establish when Culkar became aware that his 20 percent ownership interest was taken from him and distributed to the other partners.

{¶ 111} As such the evidence at trial established that Culkar, as an owner of the company, had an ownership interest in West 6th and its distributions, that the other partners of West 6th stopped giving him distributions to which he was entitled as an owner and wrongfully took his ownership interest without his knowledge or compensation, which caused Culkar damage as he did not receive distributions and lost the value of his ownership interest. This evidence is sufficient to establish a claim for conversion of his distribution payments and shares against the West 6th Parties; however, the statute of limitations is at issue here.

{¶ 112} We find, construing the evidence in the light most favorable to Culkar, that there was sufficient evidence of a conversion claim for any distributions made after 2017. Culkar was aware as early as 2013 that he was not receiving his distribution payments and, applying the four-year statute of limitations and discovery rule, we find the conversion claims for converted distributions prior to 2018 are barred by the statute of limitations.

**{¶ 113}** Regarding his converted shares, construing the evidence in the light most favorable to Culkar establishes that he learned he was no longer a partner in 2022 when the amended complaint was filed. The evidence presented established that Culkar did not receive his 2017 K-1 until after 2018. There was no evidence presented at trial to controvert this. Furthermore, the evidence that Culkar knew he was not receiving distributions would not be a cognizable event for the loss of his ownership interest since he had not been receiving distributions for years prior to the loss of his shares in 2017 and, as far as he knew, as recently as 2016, he still had his ownership interest.

**{¶ 114}** We note that the West 6th Parties raise in their brief in opposition to Culkar's cross-appeal that the doctrines of unclean hands and laches apply to this counterclaim. These affirmative defenses were never presented, considered or decided on by the trial court and the issue of their applicability will not be decided for the first time on appeal. *Cleveland Town Ctr. L.L.C. v. Fin. Exchange Co. of Ohio, Inc.*, 2017-Ohio-384 (8th Dist.) (Appellate courts "will not consider a question not presented, considered, or decided by a lower court.").

**{¶ 115}** Wherefore, we find the trial court properly granted a directed verdict for Culkar's counterclaim for conversion of his distribution payments made prior to four years before he filed his counterclaim and improperly granted a directed verdict for any other distribution claims. We further find the trial court improperly granted a directed verdict for his counterclaim for conversion of his ownership interest in West 6th.

**{¶ 116}** Culkar's second assignment of error is overruled, in part, and sustained, in part.

**{¶ 117}** We therefore affirm in part, reverse in part, and remand this matter to the trial court to retry the West 6th Parties' claim for breach of fiduciary duty and Culkar's conversion claim as detailed above.

It is ordered that appellants/cross-appellees and appellees/cross-appellants share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

LISA B. FORBES, P.J., and
DEENA R. CALABRESE, J., CONCUR